892 P.2d 230 (1995)
MEHAFFY, RIDER, WINDHOLZ & WILSON; John R. Mehaffy; James Windholz; James A. Windholz, P.C.; O'Connor & Hannan; and Arnold Kaplan, Petitioners/Cross-Respondents,
v.
CENTRAL BANK DENVER, N.A., formerly Central Bank of Denver, Respondent/Cross-Petitioner.
No. 93SC421.
Supreme Court of Colorado, En Banc.
January 30, 1995.
As Modified on Grant of Clarification and Denial of Rehearing February 21, 1995.[*]
*232 Faegre & Benson, Michael S. McCarthy, Charlotte Wiessner, Denver, for petitioners/cross-respondents Mehaffy, Rider, Windholz & Wilson and John R. Mehaffy.
Montgomery, Little & McGrew, David C. Little, William H. ReMine, III, Englewood, for petitioners/cross-respondents James Windholz and James A. Windholz, P.C.
Holland & Hart, William C. McClearn, Charles M. Johnson, Denver, for petitioners/cross-respondents O'Connor & Hannan and Arnold R. Kaplan.
John E. Bush, P.C., Denver, for respondent/cross-petitioner.
Holme Roberts & Owen LLC, John R. Webb, Jeffrey A. Chase, Susan B. Prose, John W. Dunn, President, Colorado Bar Ass'n, Denver, for amicus curiae Colorado Bar Ass'n.
Justice ERICKSON delivered the Opinion of the Court.
We granted certiorari to review Central Bank Denver, N.A. v. Mehaffy, Rider, Windholz & Wilson, 865 P.2d 862 (Colo.App. 1993).[1] We affirm the court of appeals. Petitioners[2] represented the town of Winter Park (Town) and the Winter Park Development Authority (Authority) in connection with notes and bonds issued by the Authority in 1984 and 1985.[3] Central Bank Denver, *233 N.A. (respondent), purchased the notes and bonds. Respondent's claims against petitioners are predicated on opinion letters that petitioners prepared at the request of their clients in connection with the offering and sale of the notes and bonds of the Authority. The court of appeals held that an attorney who issues an opinion letter for the purpose of inducing a non-client to purchase municipal notes or bonds can be liable for negligent misrepresentation when the opinion letter contains material misstatements of fact. We agree with the court of appeals and the remand of respondent's negligent misrepresentation claim against petitioners to the district court for trial.

I
In January 1983, the Winter Park Town Council (Town Council) created the Authority to improve certain blighted areas within the Town's limits.[4] The Authority adopted an urban renewal plan (Plan) to construct projects paid for by property tax increment financing. The Town Council set a public hearing on the proposed Plan as required by section 31-25-107(3), 12B C.R.S. (1986).[5] Instead of holding a public hearing or making the factual findings required under section 31-25-107(4), 12B C.R.S. (1986),[6] the Town Council submitted the Plan to the electorate for approval at a special election. After the voters approved the Plan and the Town Council adopted the Plan, the Authority issued $4 million in Notes (1984 Notes) to finance the construction of a parking garage. Hanifen Imhoff, Inc. (Hanifen) was the underwriter for the 1984 Notes. Respondent expressed interest in purchasing the 1984 Notes and began negotiating the terms and conditions of the purchase.
Before respondent purchased the 1984 Notes, East Grand County School District and other governmental entities (school district) filed a lawsuit against the Town, the Town Council, and the Authority in the district court, claiming that the Town Council had failed to make certain findings of fact required by section 31-25-107(4). Respondent informed Hanifen that it would not purchase the 1984 Notes if there was any risk that the lawsuit would succeed and cause a default on the 1984 Notes.
Hanifen assured respondent that the lawsuit had no merit, and that bond counsel, O'Connor & Hannan, would certify that all necessary steps to secure the tax revenue required to finance the 1984 Notes had been taken. Respondent contacted Arnold Kaplan of O'Connor & Hannan. Kaplan assured respondent that an opinion letter, stating that the lawsuit had no merit, would be issued by Mehaffy, Rider, Windholz & Wilson, counsel for the Town and the Authority. Mehaffy, Rider, Windholz & Wilson, issued an opinion letter on September 24, 1984, stating that the lawsuit did not have merit. On September 24, 1984, O'Connor & Hannan issued an opinion letter stating that the 1984 Notes were validly issued and agreed that the lawsuit had no merit. These opinion letters were *234 provided to respondent, and respondent purchased the 1984 Notes from Hanifen for $4 million in reliance on counsels' representations.
In February 1985, the Authority issued $4.5 million in Notes (1985 Notes), in order to retire the 1984 Notes. Mehaffy and Kaplan advised the respondent that the 1985 Notes were valid, and that the lawsuit had no merit. These opinion letters were provided to respondent. Windholz, who had been retained to defend the Authority against the lawsuit, prepared a letter to Kaplan and respondent that expressed his opinion that the allegations in the lawsuit were without merit.
On February 28, 1985, respondent submitted a private placement letter (referred to by the parties as a "comfort letter") to the Town and the Authority, in which respondent stated that it was relying on its own investigation of all material facts relating to the transaction. Respondent purchased the 1985 Notes on February 28, 1985.
On April 4, 1985, the district court dismissed the lawsuit, holding that the Town Council had made the factual findings required by section 31-25-107(4). On April 24, 1985, the parties to the lawsuit, through Windholz, submitted a joint stipulation of fact to the district court, stating that the Town Council had not made the factual findings required by section 31-25-107(4) before submitting the Plan to the electorate for approval. The stipulation was filed in support of the school district's motion to reconsider the dismissal of the lawsuit. The motion to reconsider was granted on October 23, 1985.
While the district court had the motion for reconsideration under advisement, the Authority issued Winter Park Development Authority Tax Increment Refunding and Improvement Bonds, Series 1985A[7] (1985A Bonds) to retire the 1985 Notes. In connection with the issuance of the 1985A Bonds, respondent issued a second comfort letter, dated October 16, 1985, that was identical in all material respects to the February 28, 1985, comfort letter. Respondent refused to purchase the 1985A Bonds without assurances from petitioners that the lawsuit was without merit. Mehaffy, Kaplan, and Windholz each issued opinion letters stating that the 1985A Bonds were valid, and advised the respondent that the lawsuit had no merit. On October 24, 1985, respondent purchased the 1985A Bonds for $5,015,000.
On March 11, 1986, the district court granted the school district's motion for partial summary judgment invalidating the Town Council's approval of the Plan, and invalidating the financing for the 1985A Bonds. In East Grand County School District v. Winter Park, 739 P.2d 862 (Colo.App. 1987), the court of appeals affirmed the district court.[8] Because the financing for the 1985A Bonds was invalidated, Grand County refused to remit incremental property tax revenues to the Authority. The Authority was unable to provide sufficient funds to the trustee[9] to make the interest payments for the 1985A Bonds, and the 1985A Bonds went into default.
Respondent filed a complaint against the petitioners, the Town, the Town Council, and the Authority.[10] The petitioners, the Town *235 Council, and the Authority moved to dismiss the complaint for failure to state a claim upon which relief can be granted. The district court dismissed respondent's claims,[11] concluding that petitioners were not liable because respondent had not entered into an attorney-client relationship with any of the petitioners. Respondent argued for reversal of the district court's dismissal of the claims against petitioners based upon the tort of negligent misrepresentation. A divided panel of the court of appeals held that liability for negligent misrepresentation can attach to an attorney who issues an opinion that contains material misstatements of fact when the opinion is issued on behalf of a client for the purpose of inducing a non-client to purchase municipal notes or bonds, and reversed and remanded to the district court for trial. The court of appeals held that respondent's comfort letter was ambiguous, and did not preclude respondent's reliance on petitioners' opinion letters. We agree with the court of appeals.

II
Summary judgment is proper under C.R.C.P. 56(c) "only when the pleadings, affidavits, depositions, or admissions show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Civil Serv. Comm'n v. Pinder, 812 P.2d 645, 649 (Colo.1991). The burden is on the moving party to establish the nonexistence of a genuine issue of material fact in order to succeed on summary judgment. Id. To satisfy its burden, the moving party may demonstrate that there is no evidence in the record to support the nonmoving party's case. Id. Because summary judgment is a drastic remedy, all doubts as to the existence of disputed facts must be resolved against the party moving for summary judgment. KN Energy, Inc. v. Great Western Sugar Co., 698 P.2d 769, 776 (Colo.1985).

A
Generally, an attorney is not liable to a non-client absent a finding of fraud or malicious conduct by the attorney. See, e.g., Schmidt v. Frankewich, 819 P.2d 1074, 1079 (Colo.App.1991); McGee v. Hyatt Legal Services, Inc., 813 P.2d 754, 757 (Colo.App.1990). An attorney's liability to non-clients has been limited for various reasons, including the potential liability of an attorney to an unforeseeable and unlimited number of third parties, as well as the adversarial nature of litigation. Montano v. Land Title Guarantee Co., 778 P.2d 328, 330-31 (Colo.App.1989).
The present case involves a business transaction in which petitioners made representations to respondent about the success of a lawsuit in order to induce respondent to purchase notes and bonds. Respondent solicited petitioners' opinions on the validity of the issuance of the 1984 and 1985 Notes and 1985A Bonds. The business deal between petitioners and respondent was not an adversarial one, but one in which respondent relied on petitioners' representations in purchasing the 1984 and 1985 Notes and 1985A Bonds.
It is well established in Colorado that "a claim of negligent misrepresentation based on principles of tort law, independent of any principle of contract law, may be *236 available to a party to a contract." Keller v. A.O. Smith Harvestore Prods., 819 P.2d 69, 72 (Colo.1991). Privity is not a necessary element of a claim for negligent misrepresentation. Galie v. RAM Assocs. Management Servs., 757 P.2d 176, 178 (Colo.App.1988). We have defined "negligent misrepresentation" according to section 552 of the Restatement (Second) of Torts (1977). Keller, 819 P.2d at 71 n. 2. Section 552 of the Restatement (Second) of Torts provides, in relevant part:
(1) One who, in the course of his business profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
(2) Except as stated in subsection (3), the liability stated in subsection (1) is limited to loss suffered
(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and
(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.
The tort of negligent misrepresentation provides a remedy when money is lost due to misrepresentation in a business transaction. Western Cities Broadcasting, Inc. v. Schueller, 849 P.2d 44, 49 (Colo.1993). To establish a claim for negligent misrepresentation, it must be shown that the defendant supplied false information to others in a business transaction, and failed to exercise reasonable care or competence in obtaining or communicating information on which other parties justifiably relied. Burman v. Richmond Homes Ltd., 821 P.2d 913, 919 (Colo. App.1991).
Professionals other than attorneys are subject to liability to third persons for negligent misrepresentation in Colorado.
See, e.g., Messler v. Phillips, 867 P.2d 128 (Colo.App.1993) (real estate broker who represented seller may be liable under negligent misrepresentation theory to purchaser of townhome even though broker did not formally contract to represent purchaser); Marquest Medical Products, Inc. v. Daniel, McKee & Co., 791 P.2d 14 (Colo.App. 1990) (implicitly recognizing liability of certified public accountants for negligent misrepresentation because accountants provided financial information about a client to a third person who relied on the representations to ship goods under a credit agreement); Wolther v. Schaarschmidt, 738 P.2d 25 (Colo. App.1986) (engineer retained by lender's appraiser to inspect home may be liable for negligent misrepresentation to borrower). A theory of negligent misrepresentation is proper where a professional knows that its representation will be relied upon by a non-client for business purposes.
Other jurisdictions have held attorneys liable for negligent misrepresentation to non-clients. See, e.g., Molecular Technology Corp. v. Valentine, 925 F.2d 910 (6th Cir. 1991) (stating that under Michigan law of negligent misrepresentation an attorney owes a duty to third parties the attorney knows will rely on the information and to third parties the attorney should reasonably foresee will rely on the information); Horizon Financial v. Hansen, 791 F.Supp. 1561 (N.D.Ga.1992) (concluding that attorneys' opinion letters support claim for negligent misrepresentation under both Pennsylvania and Georgia law); see also Third-Party Legal Opinion Report, Inducing the Legal Opinion Accord, of the Section of Business Law, American Bar Association, 4 Bus.Law. 167 (Nov. 1991).
In Crossland Savings FSB v. Rockwood Insurance Co., 700 F.Supp. 1274 (S.D.N.Y. 1988), a limited partnership sought financing. In order to induce prospective lenders, the partnership requested its counsel to issue an opinion letter that made various representations about the partnership. InterDiscount Ltd. made a loan to the partnership and then *237 assigned the promissory notes to Rockwood. Rockwood relied on the letter in accepting the assignment, and later asserted a claim of negligent misrepresentation against the attorney who issued the opinion letter because of the attorney's false representations in the letter. The court denied the attorney's motion to dismiss the claim and held that Rockwood stated a cognizable claim for recovery for negligent misrepresentation. The court stated:
When a lawyer at the direction of her client prepares an opinion letter which is addressed to the third party or which expressly invites the third party's reliance she engages in a form of limited representation.... Although the attorney is paid by and represents her client, in the opinion letter she expressly states (with her client's consent) that she is rendering a legal service to the third party. Commentators have agreed that the attorney owes a duty to the third party if the opinion letter is either addressed to the third party or expressly authorizes his reliance.
Id. at 1282 (citations omitted).
In the present case, respondent requested that the Town and the Authority issue opinion letters because of the potential damage of the lawsuit on the Authority's ability to pay off the 1984 and 1985 Notes and the 1985A Bonds. Petitioners' opinion letters were prepared for the benefit of respondent and most of the letters were addressed to the respondent. The letters assured respondent that the lawsuit did not have merit. The opinion letters were not issued in the context of an adversarial relationship, but were issued in order to secure respondent's participation in a business relationship that would mutually benefit the Town, the Authority, and respondent. Accordingly, by issuing legal opinion letters for the purpose of inducing respondent to purchase the 1984 and 1985 Notes and 1985A Bonds, petitioners may be liable to respondent for negligent misrepresentation.

B
Petitioners argue that because their opinion letters express opinions of law, they cannot be liable for negligent misrepresentation. The court of appeals held that petitioners' opinion letters are mixed statements of law and fact that might constitute misrepresentations of material fact on which to base petitioners' liability. We agree with the court of appeals.
In a claim for negligent misrepresentation, the misrepresentation must be of a material fact that presently exists or has existed in the past. Van Leeuwan v. Nuzzi, 810 F.Supp. 1120, 1124 (D.Colo.1993). A promise relating to future events without a present intent not to fulfill the promise is not actionable. Id. Expressions of opinion cannot support a misrepresentation claim. Id.; see, e.g., Chacon v. Scavo, 145 Colo. 222, 358 P.2d 614 (1960) (representations as to whether certain lots were usable as building sites required an interpretation of the relevant city ordinances, and were not actionable because they were representations of law); Two, Inc. v. Gilmore, 679 P.2d 116 (Colo. App.1984) (hotel owner's representation to plaintiff was an individual belief and opinion concerning the purchase, sale, and dispensation of liquor, and was a representation of law that was not actionable).
In Kunz v. Warren, 725 P.2d 794 (Colo. App.1986), a licensed real estate broker and a licensed real estate salesman represented to buyers of lots that the lots were ready to be sold as building sites. The court of appeals held that:
[the] representation concerned the subdivision's existing status, and was made in the face of their knowledge that the El Campo Estates subdivision had only been conditionally approved by the pertinent zoning authority. This constituted a misrepresentation of fact, not requiring a legal opinion such as might be required to determine the adequacy of a legal filing in the county land records, or the applicability of a city ordinance restricting land use.
Id. at 797.
Petitioners' opinion letters state, in relevant part:
I am of the opinion that the Town and the Authority have adopted the Urban Renewal Plan in accordance with requirements of the laws of the State of Colorado and the *238 Charter of the Town. In addition, I am of the opinion that the Town, in determining that the Project Area constituted a "blighted area" within the meaning of the Act, acted in compliance with applicable provisions of Colorado law and the Charter of the Town. Accordingly, I am of the opinion that insofar as the said litigation questions the adoption of the Urban Renewal Plan or the determination that the Project Area is a "blighted area," such allegations are without merit.[12]
The opinion letters state that the Town and the Authority complied with section 31-25-107(4) before adopting the Plan. Compliance with section 31-25-107(4) requires that particular factual findings be made before the Plan is adopted. In East Grand County School District v. Winter Park, 739 P.2d 862, 865-66 (Colo.App.1987), the court of appeals held that the statutorily required factual findings under section 31-25-107(4), regarding the need for an urban renewal program, were not made by the Town Council before the matter was referred to the electorate.
Petitioners' opinion letters make statements that may constitute statements of fact, not merely representations of law. In resolving motions for summary judgment, all doubts as to the existence of disputed facts must be resolved against the party moving for summary judgment. KN Energy, Inc. v. Great Western Sugar Co., 698 P.2d 769, 776 (Colo.1985). Whether there has been a misrepresentation is a question of fact to be determined by the trier of fact. Feit v. Donahue, 826 P.2d 407, 412 (Colo.App.1992).

C
Reliance is a necessary element of a claim for negligent misrepresentation. Keller v. A.O. Harvestore Prods., 819 P.2d 69, 71 n. 2 (Colo.1991). Petitioners contend that the comfort letters issued by respondent disclaim respondent's reliance on petitioners' opinion letters and preclude respondent's claim for negligent misrepresentation. The court of appeals held that because material issues of fact appear in the comfort letters, the comfort letters do not, as a matter of law, preclude respondent's claim of negligent misrepresentation.[13] We agree with the court of appeals.
The February 28, 1985, and the October 16, 1985, comfort letters state, in relevant part:
Further, it is understood that the Original Purchaser [respondent] has undertaken to verify the accuracy, completeness and truth of any statements made or to be made concerning any of the material facts relating to this transaction, including information regarding the Issuer [Authority]. The Original Purchaser has conducted its own investigation to the extent it believes necessary. The Original Purchaser has been offered an opportunity to have made available to it any and all such information it might request from the Issuer. On this basis, the Original Purchaser agrees that it is not relying on any other party or person to undertake the furnishing or verification of information relating to this transaction.
*239 The meaning of the comfort letters should be construed in the context of the transactions between the Authority and the respondent. See In re Application for Water Rights of Estes Park v. Northern Colorado Water Conservancy Dist., 677 P.2d 320, 327 (Colo.1984) (stating that separate documents in same transaction should be read together in order to ascertain the agreement of the parties). The 1984 and 1985 transactions between the Authority and the respondent involved affidavits, motions, private placement memorandums, opinion letters issued by petitioners, and certifications by the Authority.[14] The comfort letters should be read together with the other documents in the 1984 and 1985 transactions to determine the agreement of the parties.
Respondent's investigation of the transactions was limited to the extent it believed necessary. By inquiring whether the lawsuit had merit, respondent sought assurances from petitioners about the likelihood of success of the lawsuit. Because petitioners issued opinion letters that stated that the lawsuit did not have merit, respondent may have been influenced not to conduct further investigations into the merits of the lawsuit. Whether respondent's comfort letters disclaimed its reliance on petitioners' opinion letters is a material issue of fact that precludes summary judgment.

III
In its cross-petition, respondent contends that the district court erred in dismissing its malpractice claim against petitioners. Respondent's appeal from the district court's dismissal of all claims was predicated solely on the claim of negligent misrepresentation. The court of appeals did not specifically address the district court's dismissal of respondent's malpractice claim. We disagree with respondent and hold that the district court properly dismissed respondent's malpractice claim against petitioners.
A party must prove the existence of an attorney-client relationship between the complaining party and the lawyer in order to prevail on a claim of legal malpractice. See, e.g., Fleming v. Lentz, Evans, & King, P.C., 873 P.2d 38 (Colo.App.1994) (stating that in order to establish a prima facie case of legal malpractice, the client must show that the attorney breached a duty of care owed to the client, and the client suffered damages as a result of the breach); Schmidt v. Frankewich, 819 P.2d 1074, 1077 (Colo.App.1991) (holding that because no attorney-client relationship existed between plaintiffs and attorneys, plaintiffs' claim of attorney malpractice was properly dismissed by the district court); see also, Anoka Orthopaedic Assocs., P.A. v. Mutschler, 773 F.Supp. 158, 166 (D.Minn. 1991) (footnotes omitted) (Under Minnesota law, a plaintiff must establish three elements to prove legal malpractice: "(1) that an attorney-client relationship existed; (2) that the attorney acted negligently or in breach of contract; and (3) that the negligence or breach proximately caused damage to the plaintiff.").
In the medical context, we have held that a doctor-patient relationship must exist for a patient to assert a malpractice claim against a doctor. Greenberg v. Perkins, 845 P.2d 530 (Colo.1993). In Perkins, a personal injury action was commenced against defendants, the bus driver and the owner-operator of the bus, for injuries Perkins sustained in a bus accident. While the litigation was pending, defendants asked Perkins to undergo an independent medical examination with Dr. Greenberg in order to ascertain the extent of her injuries. Dr. Greenberg had Perkins undergo a series of tests. Perkins claimed that she was injured by the tests.
We held that Dr. Greenberg had a duty of care to Perkins to conduct the examination so that Perkins would not be harmed. Id. at 535. However, Perkins could not assert a medical malpractice claim against Dr. Greenberg because there was no doctor-patient relationship between the parties. Id. at 534.
*240 We stated that "[m]edical malpractice is a particular type of negligence action." Id.
Our analysis of legal malpractice parallels our analysis of medical malpractice. A legal malpractice claim should be limited to the attorney-client relationship because of the duty that an attorney owes "to his client to employ that degree of knowledge, skill, and judgment ordinarily possessed by members of the legal profession in carrying out the services for his client." Temple Hoyne Buell v. Holland & Hart, 851 P.2d 192, 198 (Colo. App.1992). Because attorneys do not owe a duty of reasonable care to non-clients, attorney malpractice cannot extend to non-clients. Attorney malpractice is a particular type of negligence that is confined to situations in which an attorney-client relationship exists between a plaintiff and a defendant.

IV
Accordingly, we affirm the judgment of the court of appeals and the remand of respondent's negligent misrepresentation claim against petitioners to the district court for trial.
ROVIRA, C.J., dissents, and MULLARKEY, J., joins in the dissent.
Chief Justice ROVIRA, dissenting:
The majority concludes that Central Bank Denver, N.A. (Bank) has stated a claim upon which relief can be granted based upon the tort of negligent misrepresentation. While we have recognized that professionals may owe a duty of care to third parties who justifiably rely on factual statements provided in a business setting, see Keller v. A.O. Smith Harvestore Products, 819 P.2d 69 (Colo.1991), the majority incorrectly concludes that negligent misrepresentation should be recognized in the legal context. Even assuming such a duty is appropriately imposed, under the facts of this case the Bank has failed to establish a claim for negligent misrepresentation as a matter of law.

I.
The majority accurately sets forth the facts underlying the dispute between the Bank and counsel[15] regarding the issue of the Winter Park Development Authority (Authority) Urban Renewal Redevelopment bonds. Although the Bank originally sued the Town of Winter Park (Town) and the Authority, the claims were time barred and have since been dismissed. Central Bank Denver v. Town of Winter Park, 92CA1560 (Colo.App. Dec. 16, 1993) (not selected for official publication). As a result, counsel remain the sole defendants available to shoulder liability for the Bank's losses.
I believe, however, the majority does not adequately recount the collateral dispute between the Town and the Grand County School District 2 (School District) that prompted counsel's delivery of the opinion letters. Because the facts known to counsel when the opinion letters were prepared provide the basis for any negligent misrepresentation claim, a brief history of this controversy needs to be set out.
In June 1984, prior to issuing any notes or bonds, the Town council adopted a resolution to submit to the voters the issues raised by the proposed Urban Renewal Redevelopment Plan (Plan).[16] In Referendum 117, the voters approved the Plan by a vote of 72 to 53. The Referendum contained all of the statutorily required factual findings together with a recitation that the Town council thereby made all of the required findings.[17] By later *241 resolution (No. 178) the Town council approved the election results and confirmed adoption of the Plan and the statutory findings.
On September 6, 1984, the East Grand County School District filed a lawsuit challenging the adoption and implementation of the Plan, claiming that the Town council failed to make the findings of fact required by statute. On April 4, 1985, the trial court dismissed the School District's complaint against the Town and the Authority finding that "the Winter Park Town Council made the necessary findings after public hearings as required by C.R.S. XX-XX-XXX ..." The parties then submitted a joint stipulation of fact acknowledging that the Town council had not made the factual findings required by section 31-25-107(4) prior to referring the issue to the voters. Based upon this stipulation, the trial court granted a motion to reconsider and later reversed its prior order, finding that the Plan did not comply with the statutory requirements, and as a result declared the Plan void on March 26, 1986.
In East Grand County School Dist. 2 v. Winter Park, 739 P.2d 862 (Colo.App.1987), the court of appeals affirmed, concluding that the incorporation of the required factual findings into a proposed ordinance submitted to the voters did not satisfy the statutory requirements. Id. at 865. The Town council's decision to adopt the findings simultaneously with the approval of the referendum resulted in invalidation of the Plan, and ultimately caused the Town to default on the Series 1985A Bonds.

II. Duty to Non-client Third Parties
The majority correctly points out the longheld view in Colorado that attorneys do not owe a duty to non-client third parties absent fraud or malice. Maj. op. at 235-36. We have consistently declined the opportunity to overturn the principle initially articulated by the court of appeals nearly twenty years ago that an attorney "[w]hile fulfilling his obligation to his client, [ ] is liable for injuries to third parties only when his conduct is fraudulent or malicious." Weigel v. Hardesty, 37 Colo.App. 541, 543, 549 P.2d 1335, 1337 (1976).[18] The majority summarily dismisses this established tenet, concluding that because we have recognized a claim for relief for negligent misrepresentation, we should recognize that attorneys too may be liable under this doctrine. Though courts have recently become more willing to impose third-party liability upon attorneys, see Joan Teshima, Annotation, Attorney's Liability, to One Other Than Immediate Client, for Negligence in Connection with Legal Duties, 61 A.L.R.4th 615 §§ 11-14 (1988 & 1994 Supp.), in my view the majority too quickly imposes a duty where historically none has existed. In so doing it fails to adequately consider the unique nature of attorney-client relationships.
The court of appeals first recognized the tort of negligent misrepresentation in First National Bank v. Collins, 616 P.2d 154 (Colo. App.1980). We considered the availability of this claim for relief over a decade later in Keller v. A.O. Smith Harvestore Products, 819 P.2d 69 (Colo.1991). There, we concluded that in some circumstances a claim of negligent misrepresentation may be available to contracting parties in addition to any claim *242 for breach of contract. Keller, 819 P.2d at 72. Here, the majority concludes that our prior recognition of this claim, and the willingness of a few jurisdictions to use this claim as a basis for attorney liability sanctions our imposition of liability in this case. Maj. op. at 236-37. In my view the majority collapses the legal duty analysis into the definition of the claim for relief. However, the question on appeal is "[w]hether an attorney who issues a legal opinion in connection with a municipal note or bond offering owes a duty to a non-client that would support a claim for negligent misrepresentation...." The majority ignores the initial inquiry of whether the relationship between the parties should give rise to any legal duty.
Before any action grounded in negligence can be maintained the defendant must owe the plaintiff a duty of care. See Perreira v. State, 768 P.2d 1198, 1208 (Colo.1989); Turner v. Grier, 608 P.2d 356 (Colo.App.1979); see also Miami Int'l Realty Co. v. Paynter, 841 F.2d 348, 353 (10th Cir.1988) (explaining the elements of negligent misrepresentation must be looked at in conjunction with general principles of negligence law). Imposition of a legal duty and the scope of that duty is a question of law. See, e.g., Connes v. Molalla Transp. Sys., Inc., 831 P.2d 1316, 1320 (Colo. 1992); Perreira, 768 P.2d at 1208. We have on several occasions delineated the factors that require consideration prior to imposing a duty of care, including: (1) the risk involved; (2) the foreseeability and likelihood of injury as weighed against the social utility of the actors' conduct; (3) the magnitude of the burden of guarding against injury or harm; and (4) the consequences of placing the burden upon the actor.[19]See, e.g., Bath Excavating & Constr. Co. v. Wills, 847 P.2d 1141, 1147 (Colo.1993). In refusing to recognize third-party claims against attorneys absent fraud or malice, courts have recognized several policies that militate against expanding attorney liability: (1) the attorney's duty of loyalty and effective advocacy for his client; (2) the nature of the adversarial relationship between an attorney and other parties; and (3) the potential liability to an unlimited number of third parties if attorney liability to third parties should be extended. See, e.g., Montano v. Land Title Guar. Co., 778 P.2d at 330-31. Here, the majority fails to weigh those factors that we have explained require consideration before imposing a legal duty, and dismisses the policies underlying decisions where courts have declined to impose attorney third-party liability. Instead, the majority concludes a legal duty can be imposed based on its view that the parties' relationship was not adversarial, and that reliance on the opinion letters was foreseeable. Maj. op. at 237. I believe these factors are not dispositive, and are better viewed in the context of all the factors to be considered when imposing a legal duty. We have explained that a court's determination of whether a legal duty exists is "an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is [or is not] entitled to protection." Observatory Corp. v. Daly, 780 P.2d 462 (Colo.1989) (citations omitted).

1. Risk.
Here, the risk involved is the possibility of injury to a sophisticated third party lender. Typically, financing transactions carry some degree of risk that the deal will fail. No question exists that legal opinion letters serve as valuable tools in financing transactions to help evaluate these risks. See Committee on Legal Opinions, Third Party Legal Opinions, 47 Bus.Law. 167 (1991-92). Because financing transactions have some inherent risk, whether liability should be imposed depends not only on the existence of the risk, but also upon whether the opinion writer is rightly considered an insurer or guarantor of the expression of professional *243 judgment.[20] The comments to Restatement (Second) of Torts section 552 explain "one who relies upon information in connection with a commercial transaction may reasonably expect to hold the maker to a duty of care only in circumstances in which the maker was manifestly aware of the use to which the information was to be put and intended to supply it for that purpose." Restatement (Second) of Torts § 552 cmt. a. While counsel was aware that the opinions would be relied upon to evaluate the merit of the existing lawsuit and the risk of harm, nowhere in the record nor the letters does it indicate that counsel knew the purpose of the opinion was to transform them from advisors to insurers.

2. Foreseeability of injury weighed against social utility.
Here, a likelihood existed that the Bank would suffer injury if counsel's opinions proved incorrect. Indeed, the bank's injury has manifested itself in this lawsuit. Foreseeability is not, however, the sole test for imposing a duty. See Observatory Corp., 780 P.2d at 468. The social utility of counsel's conduct must be weighed. In my view the policies previously articulated to reject imposition of a duty relate to the social utility of counsel's conduct. The majority's statement that the "business deal between petitioners [counsel] and respondent [Bank] was not an adversarial one, but one in which respondent relied on petitioners' representations," maj. op. at 235, does not alter the fact that here counsel at all times represented the Town and the Authority, and owed the highest duty of loyalty to these clients, not to the Bank.

3. The magnitude of the burden of guarding against such harm.
This question goes to the Bank's role in this dispute. I believe the Bank, sophisticated in the business of purchasing municipal securities, could have ascertained the risks involved in the lawsuit which was fully disclosed in the underwriter's private placement offering. The dispute was a matter of public record, involving questions of statutory interpretation. Moreover, the Bank expressly assumed the burden of guarding against the harm. It conducted an investigation of the Bond issue, evidenced by the Private Placement Letter delivered to the Bond Underwriters, and determined to proceed with the transaction.[21] That the Bank's efforts failed to protect against risk of loss does not require this court to transfer this burden to counsel.

4. The consequences of placing the burden upon the actor.
The consequences of imposing third party liability upon attorneys have not yet been fully explored. Arguably, benefits will accrue to all individuals involved in third party transactions if attorneys undertake to more carefully assess risks. However, burdening attorneys with a duty to parties other than their client raises questions regarding impermissible conflicts of interest.[22] The attorney may find herself placed in the middle of a transaction, liable to both parties. See, e.g., *244 Douglas A. Cifu, Expanding Legal Malpractice to Non-Client Third PartiesAt What Cost?, 23 Colum.J.L. & Soc.Probs. 1, 13 (1989); see also Goodman v. Kennedy, 18 Cal.3d 335, 134 Cal.Rptr. 375, 381, 556 P.2d 737, 743 (1976):
The attorney's preoccupation or concern with the possibility of claims based on mere negligence (as distinct from fraud or malice) by any with whom the client might deal "would prevent him from devoting his entire energies to his client's interests." The result would be both "an undue burden on the profession" and a diminution in the quality of the legal services received by the client. (internal citations omitted).
The majority fails to give adequate consideration to all of the policies implicated in imposing liability. Based upon my understanding of those policies I am not persuaded that counsel owed a legal duty to the Bank.

III. Summary judgment
Even under the majority's rationale, the district court properly dismissed the Bank's claims upon summary judgment. The majority correctly sets forth the standards for granting summary judgment. Maj. op. at 235. Genuine issues of material fact, however, are not raised simply by means of counsel's argument, but must be raised by specific factual allegations showing a factual controversy. See Goldman v. Union Bank and Trust, 765 P.2d 638, 640 (Colo.App.1988). Assuming counsel owed a duty to the Bank, under the circumstances of this case no factual controversy has been demonstrated, and the Bank's claims should be dismissed as a matter of law.
Restatement (Second) of Torts, section 552 provides that:
(1) One who, in the course of his business, profession or employment, ... supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
Restatement (Second) of Torts § 552 (1976).[23]
In my view two of the prerequisites to establish a claim for negligent misrepresentation are not present as a matter of a law.

A. No false information.
"Expressions of opinion cannot support a misrepresentation claim." Maj. op. at 237; see also Chacon v. Scavo, 145 Colo. 222, 358 P.2d 614 (1960). The majority concludes the opinion letters were "mixed statements of law and fact." Maj. op. at 237.[24] It goes on to declare that "[t]he opinion letters state that the Town and Authority complied with section 31-25-107(4) before adopting the Plan." Maj. op. at 238. The letters contain no such specific representation regarding the adoption of the factual findings. The pertinent portions of the opinion letters, each of *245 which follow substantially the same format, are outlined below:
Based upon the foregoing examination and review, I am of the opinion that ... [t]he Urban Renewal Plan was duly passed upon and approved by the Town in accordance with all the requirements of law,

. . . . .
With respect to the section of the Official Statement captioned "LITIGATION," I am of the opinion that the Town has adopted the Urban Renewal Plan in accordance with all requirements of the laws of the State of Colorado and the Charter of the Town. Accordingly, I am of the opinion that the plaintiffs have alleged facts in their complaints which are insufficient to allow the plaintiffs to prevail in court, and the allegations set forth therein are substantially without merit.

. . . . .
As to the remaining allegations contained in the complaints described in the section of the Memorandum captioned "LITIGATION", I am of the opinion that the plaintiffs have alleged facts in their complaints which are insufficient to allow the plaintiffs to ultimately prevail in court, and that the allegations set forth therein are without merit. Although the defendants in such an action should prevail, based upon current Colorado law, a final determination may not occur for an extended period of time.
(Emphasis supplied).
In the School District dispute, the Town, the Authority and counsel maintained that the electorate acted as the governing body competent to make the factual findings required under section 31-25-107(4). East Grand County School Dist. 2, 739 P.2d at 865. The factual findings were included in the referendum passed by the voters, and contained in the resolution adopted by the Town ratifying the election results. Id. at 864. Counsel also believed that the Town implicitly made the necessary findings upon approval of the election results. Id. at 865.
No doubt exists that the required factual findings were made by both the voters and the Town council. Disposition of the School District's claim depended upon the court's statutory interpretation of when the findings were required, and the governing body competent to make the findings. Though the court of appeals' opinion in East Grand County School Dist. 2 v. Winter Park, 739 P.2d 862 (Colo.App.1987), is not under review, the court's conclusion that the Plan was void because the findings were not made prior to adoption of the resolution does not convert counsel's opinions into misrepresentations.[25]
No material misstatement occurred when counsel stated that in its opinion, "the Plan was duly passed upon and approved by the Town in accordance with all the requirements of law." Instead, the letters provided counsel's view on the merit of the School District's lawsuit. We have explained that a party who relies on a representation of law does so at its own risk. Chacon, 145 Colo. at 222, 358 P.2d at 614 ("[T]he general rule is that a representation of law is a mere expression of opinion, and impotent to avoid a contract or support an action for damages." (citations omitted)). I agree with Judge Tursi's dissenting opinion that the facts relied upon by counsel were legally insufficient to sustain the opinions, but did not constitute misrepresentations of fact sufficient to sustain liability. Central Bank v. Mehaffy, Rider, Windholz & Wilson, 865 P.2d at 867.

*246 B. No reliance.
Second, the Bank did not justifiably rely on the opinion letters as a matter of law. Close reading of the October 16, 1985, letter entitled "Private Placement Letter" demonstrates that it is a clear and unambiguous disclaimer of reliance by the Bank with respect to the Series 1985A Bond Issue.[26] The fact that the Letter should be construed in the context of the transactions between the Authority and the Town does not make the Private Placement Letter ambiguous. Considering the Letter in context clarifies that it relates to the Series 1985A Bond issue alone.
The initial paragraph of the Private Placement Letter defines "Bonds" as the Series 1985A bonds issued in the amount of $5,015,000 by the Winter Park Development Authority. These named series bonds cannot reasonably be confused with the prior issues which were consistently referred to as the 1984 and 1985 Notes.[27] The Letter is addressed to E.F. Hutton and Company, Inc., the underwriters for the Series 1985A Bonds, in contrast with the February 28, 1985, Private Placement Letter addressed to the Note underwriter, Hanifen, Imhoff Inc. The Letter refers to the October 16, 1985, Private Placement Memorandum which describes in full detail the Series 1985A Bonds.[28] Only a tortured or cursory reading would lead to the conclusion that the Letter was a disclaimer of reliance for any transaction other than the Series 1985A Bond issue.
The statement that the Bank conducted an investigation to the "extent it believes necessary" does nothing more than indicate that the Bank was subjectively satisfied with the extent of its due diligence investigation. Moreover, the letter concludes that the Bank did not "rely on any other party or person to undertake the furnishing or verification of information relating to this transaction." (emphasis supplied). "Any" means "one, no matter what one: everyused as a function word especially in assertions or denials to indicate that one that is selected is without restriction or limitation of choice." Webster's Third New International Dictionary 97 (1986). Use of the adjective "any" eliminates all speculation that the Bank relied on other parties, including counsel. Thus, the Private Placement Letter specifically negates the element of reliance required for any claim of negligent misrepresentation.
In my view both counsel's opinion letter and the Bank's disclaimer letter are exactly what they purport to be, and define the relationship between the parties. The Bank has not stated a claim upon which relief can be granted and the district court's entry of summary judgment should be affirmed.
I am authorized to say that Justice MULLARKEY joins in this dissent.
NOTES
[*] Rovira, C.J., and Mullarkey, J., would grant rehearing. Lohr, J., did not participate in considering petition for clarification or petition for rehearing.
[1] The following issues are before us for review:

1. Whether an attorney who issues a legal opinion in connection with a municipal note or bond offering owes a duty to a non-client that would support a claim for negligent misrepresentation when the legal opinion is issued at the request of his client for the purpose of inducing the non-client to purchase municipal bonds issued by the client.
2. Whether the legal opinion letters issued in this case constitute misrepresentation of present or past fact sufficient to state a claim for negligent misrepresentation.
3. Whether a letter issued by the non-client, disclaiming any reliance on the furnishing or verification of information by any party regarding the bond purchase, was ambiguous and therefore raising an issue of material fact regarding the element of justifiable reliance necessary to a claim for negligent misrepresentation.
4. Whether the trial court erred not only in granting the motion for dismissal on the claim of negligent misrepresentation, but also as to the claim of malpractice.
[2] Petitioners are the law firms of Mehaffy, Rider, Windholz & Wilson, O'Connor & Hannan, and James Windholz, P.C. (a professional corporation that is a general partner in the firm of Mehaffy, Rider, Windholz & Wilson), and individual attorneys John Mehaffy, James Windholz, and Arthur Kaplan.
[3] Mehaffy, then a partner in the firm of Mehaffy, Rider, Windholz, & Wilson, was the attorney for the Town. Windholz, then of the same firm, was retained by the Authority to represent it in a related piece of litigation filed by various governmental entities challenging the validity of the note and bond offerings. Kaplan, of O'Connor & Hannan, acted as bond counsel.
[4] The Town created the Authority pursuant to the "Urban Renewal Law," §§ 31-25-101 to -115, 12B C.R.S. (1986 & 1994 Supp.).
[5] Section 31-25-107(3) states:

The governing body shall hold a public hearing on an urban renewal plan or substantial modification of an approved urban renewal plan after public notice thereof by publication in a newspaper having a general circulation in the municipality. The notice shall describe the time, date, place, and purpose of the hearing, shall generally identify the urban renewal area covered by the plan, and shall outline the general scope of the urban renewal project under consideration.
[6] Section 31-25-107(4) provides:

(4) Following such [public] hearing, the governing body may approve an urban renewal plan if it finds that:
(a) A feasible method exists for the relocation of individuals and families who will be displaced by the urban renewal project in decent, safe, and sanitary dwelling accommodations within their means and without undue hardship to such individuals and families;
(b) The urban renewal plan conforms to the general plan of the municipality as a whole; and
(c) The urban renewal plan will afford maximum opportunity, consistent with the sound needs of the municipality as a whole, for the rehabilitation or redevelopment of the urban renewal area by private enterprise.
[7] The bonds, unlike the 1984 and 1985 Notes, were underwritten by E.F. Hutton & Company, Inc.
[8] The court of appeals stated:

To satisfy the requirements of § 31-25-107(4), the need for an urban renewal plan must be determined prior to its adoption. To hold otherwise would circumvent the legislative intent underlying the statutory requirement for the specified findings. Therefore, we hold that the approval of the election results without the necessary findings did not excuse the town council's failure to comply with the statute.
East Grand County School Dist., 739 P.2d at 866.
[9] Respondent was the designated trustee for the 1984 and 1985 Notes, and is the trustee for the 1985A Bonds under an amended and restated indenture of trust.
[10] The district court summarized respondent's allegations in its order granting petitioners' motions to dismiss:

Plaintiff's [respondent's] complaint alleges eleven claims against some or all of the Defendants [petitioners, the Town, the Town Council, and the Authority]. Claims One, Two, Three, and Four allege breach of contract against the [A]uthority, breach of trust indenture against the [A]uthority, breach of implied contract against Winter Park, and a claim against Winter Park, the [Town] Council, and the [A]uthority under C.R.C.P. Rule 106(a)(2). The fifth claim is for attorney malpractice against the attorney defendants [petitioners]. The remaining claims are against all defendants. The sixth claim alleges breach of express warranties; the seventh alleges negligent misrepresentation; the eight alleges breach of fiduciary duty; the ninth alleges violation of the Securities Act of 1933 ... [15 U.S.C. § 77q(a) (1988) ]; the tenth alleges violation of the Colorado Securities Act ... [§§ 11-51-123, -125(2), -125(5)(b), 4B C.R.S. (1987) ]; and the eleventh alleges violation of the Colorado Securities Act ... [§§ 11-51-125(3), and -125(5)(b), 4B C.R.S. (1987) ].
[11] The dismissal was made final pursuant to C.R.C.P. 54(b). Because information outside of the pleadings was submitted to the district court in conjunction with its ruling, the court of appeals considered the dismissal to be a summary judgment. C.R.C.P. 12(c).

In their motion to dismiss, petitioners argued that respondent's claims were barred by the statute of limitations. The district court did not rule on this affirmative defense. Petitioners did not raise this affirmative defense before the court of appeals, and the court of appeals did not address this issue. Because we did not grant certiorari on the statute of limitations issue, we do not address it.
[12] This statement, or a similar statement, appears in the February 28, 1985, and October 23, 1985, opinion letters of Mehaffy, and the February 28, 1985, and October 24, 1985, opinion letters of Windholz.
[13] Respondent issued two comfort letters, dated February 28, 1985 and October 16, 1985. The court of appeals analyzed a single comfort letter and stated:

In the opening paragraphs of the letter as well as in the caption designating a topic of the correspondence, the Bank's letter [respondent's comfort letter] addresses the "tax increment refunding and improvement bonds." (emphasis supplied) In the body of the letter, there is no specific reference to the opinion of counsel. Instead, reference is made generically to questions and answers from representatives of the "issuer" concerning the terms and conditions of the "offering."
....
In our view, material issues of fact appear from the comfort letter which preclude entry of summary judgment. For example, we cannot determine from the limited record whether "this transaction" refers only to the bond issue, or whether it refers as well to the 1984 and 1985 Notes. The letter is also ambiguous as to whether the legal opinion letters are indeed excluded because the referenced investigation by the Bank was limited to the extent believed necessary and the decision not to conduct further investigation may have been influenced by those opinion letters.
Central Bank v. Mehaffy, Rider, Windholz, & Wilson, 865 P.2d 862, 866-67 (Colo.App.1993).
[14] The following language appears on the face of the 1985A Bonds issued by the Authority:

It is hereby certified, recited and declared that all acts, conditions and things required to exist, happen and be performed precedent to and in the execution and delivery of the Indenture, as defined herein, and the issuance of this Bond do exist, have happened and have been performed in due time, form and manner as required by law.
[15] Petitioners include Mehaffy, Rider, Windholz & Wilson; John R. Mehaffy; James Windholz; James A. Windholz, P.C.; O'Connor & Hannan; and Arnold Kaplan (collectively referred to as counsel). John Mehaffy represented the Town of Winter Park, James Windholz represented the Authority in collateral litigation and Arnold Kaplan acted as bond counsel.
[16] The Town council had previously held two meetings at which some of the electorate voiced concern over tax increases necessary to finance the Plan. Although the council had prepared a resolution to make the appropriate findings to implement the Plan, council members adopted a resolution to put the matter to the voters at a special election. Section 5.7 of the Winter Park Home Rule Charter provides the town council with "the power to submit at a regular or special election any proposed ordinance or any question to a vote of the electors."
[17] Section 31-25-107(4) provides:

(4) Following such hearing, the governing body may approve an urban renewal plan if it finds that:
(a) A feasible method exists for the relocation of individuals and families who will be displaced by the urban renewal project in decent, safe and sanitary dwelling accommodations within their means and without undue hardship to such individuals and families;
(b) The urban renewal plan conforms to the general plan of the municipality as a whole; and
(c) The urban renewal plan will afford maximum opportunity, consistent with the sound needs of the municipality as a whole, for the rehabilitation or redevelopment of the urban renewal area by private enterprise.
§ 31-25-107(4), 12B C.R.S. (1986).
[18] See Klancke v. Smith, 829 P.2d 464, 466-67 (Colo.App.1992), cert. denied, No. 91SC797 (Colo. May 18, 1992); Schmidt v. Frankewich, 819 P.2d 1074, 1079 (Colo.App.1991), cert. denied, No. 91SC469 (Colo. Oct. 28, 1991); McGee v. Hyatt Legal Servs., Inc., 813 P.2d 754, 757 (Colo.App.1990), cert. denied, No. 90SC753 (Colo. July 29, 1991); see also Lavern Glover and Athlyn Glover v. William H. Southard, No. 93CA1261  P.2d  (Colo.App. Nov. 3, 1994); Montano v. Land Title Guar. Co., 778 P.2d 328, 331 (Colo.App.1989).
[19] The California Supreme Court has identified five factors to be considered when attorney liability for negligence to a non-client is at issue:

1. the extent to which the transaction was intended to affect the plaintiff;
2. the foreseeability of harm to the plaintiff;
3. the degree of certainty that the plaintiff suffered injury;
4. the closeness of connection between the defendant's conduct and the injury suffered;
5. the policy of preventing future harm. Biakanja v. Irving, 49 Cal.2d 647, 320 P.2d 16 (1958).
[20] The Committee on Legal Opinions in its Report on Third Party Legal Opinions explained a key premise underlying the report is that "[b]y rendering a professional opinion, the opinion giver does not become an insurer or guarantor... [n]or does rendering the opinion guarantee the outcome of any legal dispute that may arise out of the transaction." Third Party Legal Opinions, supra, at 171.
[21] In the materials provided to support the motion for summary judgment an expert articulated several straightforward methods that were available to the Bank to safeguard against the potential loss, including holding the proceeds from the 1984 issue in escrow until the lawsuit was settled, dissolving the Authority and beginning the process again to directly deal with the School District's claims, securing additional collateral such as developer guarantees or a surety, or purchasing municipal insurance. Letter from Arthur J. Zimmer to Bernard J. Sapp dated March 21, 1992.
[22] Rule 2.3 of the Colorado Rules of Professional Conduct contemplates attorney evaluation of a client matter for third-party use. The rules recognize the potential for conflict and attempt to alleviate the problem by allowing evaluation only when the lawyer reasonably believes that making the evaluation is compatible with other aspects of the lawyer's relationship with the client, while still protecting the attorney-client confidences. The comments explain that the question of whether a legal duty to a third-party arises is beyond the scope of the Rules.
[23] CJI-Civ.2d 9:3B, Negligent Misrepresentation Causing Financial Loss in a Business TransactionElements of Liability, sets out the following elements:

1. The defendant gave false information to the plaintiff;
2. The defendant gave such information to the plaintiff in the course of the (defendant's [business] [profession] [employment] ) (a transaction in which the defendant had a financial interest);
3. The defendant gave the information to the plaintiff for the (guidance) (use) of the plaintiff in a business transaction;
4. The defendant was negligent in obtaining or communicating the information;
5. The defendant gave the information with the intent or knowing that (the plaintiff) (a limited group of persons of which the plaintiff was a member) would (act) (or) (decide not to act) in reliance on the information;
6. The plaintiff relied on the information supplied by the defendant;
7. This reliance on the information supplied by the defendant caused damage to the plaintiff.
CJI-Civ.2d 9:3C defines unreasonable reliance:
One is negligent in relying on information given by another when a reasonable person in the same or similar circumstances would not have so relied.
[24] The majority later states that the "letters make statements that may constitute statements of fact, not merely representations of law." Maj. op. at 238. Close reading of the letters simply fails to indicate any factual misstatement. At the time they were rendered the opinions merely stated counsel's view on the merits of the pending lawsuit.
[25] In my view the fact that the trial court, intimately familiar with the collateral dispute between the Town and the School District, found that "the legal opinions are not statements of facts, present or past" is significant. The trial court also dismissed the Bank's claims under the Colorado Securities Act which would have required the Bank to prove "untrue statements of material fact" or omission. The court found that:

Plaintiff's Complaint does not allege any representations other than connected with the legal opinions and letters concerning the litigation.... The Court finds the claims may stand against the other defendants, but will be dismissed as to the attorney defendants.
The trial court found that two separate claims requiring a material misrepresentation could not stand based upon the opinions provided by counsel. Further, the court of appeals affirmed the trial court's dismissal of the Bank's claims under the Colorado Securities Act.
[26] Though the court of appeals and the parties characterize the Private Placement Letter as a "comfort letter" the letter does not readily fit within this category of correspondence. Comfort letters are typically issued by accountants to underwriters and are used as an integral part of the underwriter's statutory due diligence defense against liability under federal securities laws. See Bruce L. Resnik, Understanding Comfort Letters for Underwriters, 34 Bus.Law. 1725, 1745 (1979).
[27] The 1984 and 1985 notes have been fully paid and retired and the Bank has no damages stemming from their purchase.
[28] The majority correctly points out that the Bank previously executed a similar Private Placement Letter dated February 28, 1985, which referenced Notes issued in the amount of $4,500,000 in connection with a Private Placement Memorandum dated February 28, 1985. Maj. op. at 234.