**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**August 9, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

STUDENT MARKETING GROUP,
INC.,

        Plaintiff-Appellee,

    v.

COLLEGE PARTNERSHIP, INC.,
formerly known as COLLEGE
BOUND STUDENT ALLIANCE,
INC.,

        Defendant-Appellant.

Nos. 05-1427 and 06-1046

(D. of Colo.)

(D.C. No. 04-cv-1258-LTB-BNB)

**ORDER AND JUDGMENT**[*]

Before **MURPHY**, **HOLLOWAY**, and **TYMKOVICH**, Circuit Judges.

## I. Introduction

This diversity case arises from a contract dispute between Student

Marketing Group, Inc. ("SMG") and College Partnership, Inc. ("CPI") regarding a

contract to lease mailing lists of high school student names for promotional

purposes. SMG claimed CPI breached the contract by failing to make the final

---

[*] This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

three payments due under the agreement. CPI counterclaimed, alleging SMG failed to provide the quantity and quality of names promised under the contract. Additionally, CPI filed counterclaims for negligent misrepresentation and fraudulent concealment.

The district court granted SMG summary judgment on all claims and also awarded SMG costs and fees. CPI filed a motion in the district court for an amended judgment on costs and fees, specifically requesting an evidentiary hearing on the issue. While the court made some adjustments to the total award based on a clerical error, it substantially ratified the earlier award and denied CPI's request for an evidentiary hearing.

CPI now appeals (1) the order granting summary judgment, (2) the order granting the amended judgment on costs and fees, as well as (3) the district court's threshold ruling that CPI's proffered expert testimony was inadmissible under Federal Rules of Evidence 702. Because we agree that CPI has failed to raise a genuine issue of material fact with respect to any issue on summary judgment, we AFFIRM the district court's order on the merits. Moreover, we find the district court did not clearly err in making its award of costs and fees absent an evidentiary hearing and thus AFFIRM the amended judgment. Finally, the district court did not abuse its discretion in excluding CPI's expert testimony, so we allow that ruling to stand.

## II. Background

*Factual Background*

SMG is a marketing company that maintains lists of names and addresses of children, high school students, and college students. CPI is an education and career preparation company that provides products and services to college-bound high school students, using direct mail advertising to promote its business.

CPI previously leased student records from SMG from July 2002 to June 2003. Under the contract, SMG agreed to provide "up to a maximum of 600,000 High School Records per month" in exchange for a monthly fee of $25,000. Rental Ag. § I. The original contract ("Rental Agreement") expired without incident and the parties entered a renewal contract ("Renewal Agreement") for the subsequent July 2003 to June 2004 term.

The terms of the Renewal Agreement largely mirrored those of the Rental Agreement. For example, both contracts included identical language under the heading "Delivery of High School Records; Updates:"

> A. Up to a maximum of 600,000 High School Records shall be provided to Lessee [CPI] each month (on average) during the term of this Agreement, on an as needed basis, in an agreed upon electronic storage medium and in an agreed upon format.
>
> B. Monthly deliveries may contain either new or updated duplicate High School Records.[1]

---

[1] The Renewal Agreement added a third clause to Section IV, providing: "SMG represents that it currently owns approximately 5.7 million (5,700,000)

(continued...)

-3-

Rental Ag. § IV.; Renewal Ag. Sec IV. Both contracts, moreover, provided the following provisions regarding late payment:

> In consideration of the furnishing of the High School Records by SMG hereunder, Lessee [CPI] shall pay SMG in accordance with the terms specified herein. *In the event any payment is more than ten (10) days late, SMG may declare Lessee to be in default hereunder, and suspend Lessee's ability to utilize the High School Records until such time as all amounts owed to SMG are paid in full.* Without limiting any of SMG's remedies for non-payment or late payment of monthly installments, it is agreed that a monthly payment not paid by its due date will be subject to a late charge of ten percent (10%). If collection efforts are required, Lessee shall pay all costs of collection, *including reasonable attorneys' fees*.

Rental Ag. § V.B.; Renewal Ag. § V.B. (emphasis added). Neither contract includes a similarly specific provision in the event of SMG's failure to provide the sufficient student records, though both agreements provide generally:

> Either party shall be in default upon the occurrence of any one of the following events: (1) breach or failure by such party to perform any other term, condition or covenant of this Agreement and such breach or failure shall continue uncured for a period of thirty days after receipt of written notice thereof; (ii) if such party ceases the conduct of active business; (iii) if any proceedings under the US Bankruptcy Code or other insolvency laws shall be instituted by or against such party, or if a receiver shall be appointed for such party; or (iv) if such party shall make an assignment for the benefit of creditors, or admit in writing its inability to pay its debts as they come due.

Rental Ag. § X.; Renewal Ag. § X.

---

[1](...continued)
High School Records and it anticipates compiling an additional 1 to 2 MILLION High School Records by June 2004." Renewal Ag. § IV.C. The significance of this provision will be discussed in greater detail below.

Furthermore, both contracts provided that the governing law in case of conflict would depend on the party initiating suit. If CPI initiated legal action, the laws of New York would govern; if SMG initiated legal action, Colorado law would govern. Rental Ag. § XVII.; Renewal Ag. § XVII.

In spite of these similarities, significant differences also existed between the two contracts. Notably, while the Renewal Agreement maintained the commitment to providing up to 600,000 records per month, it added a global promise to provide "up to 9 MILLION" records during the course of the year:

> SMG hereby rents to Lessee up to 9 MILLION (9,000,000) High School Records (as defined hereinafter) during the term of this Agreement, for Lessee's sole and exclusive lawful use for its own direct marketing activities in connection with offers of educational products and services, subject to the restrictions on use and other terms and conditions described herein and only as explicitly provided for in this Agreement. . . .

Renewal Ag. § I.A. As unambiguous as it may seem, the quantity term "up to 9 MILLION" is at the heart of this dispute. CPI maintains that it required SMG to furnish *at least* nine million records during the one-year contract whereas SMG says the plain language required *up to* a maximum of nine million records. It is undisputed that SMG delivered 8,494,066 records to CPI over the course of the Renewal Agreement. Aplt. App. at 674, 676.

Another modification to the Renewal Agreement was made under Section V, "Payment Terms and Reporting." In Section V.A., the Rental Agreement provided: "Lessee shall pay SMG the sum of Twenty Five Thousand Dollars

($25,000.00) each month for twelve months." The Renewal Agreement, in turn, provided: "Lessee shall pay SMG the sum of $0.0515 per High School Record, payable in twelve monthly payments of $38,625 each."[2] Renewal Ag. § V.A. The product of $0.0515 and nine million records is equal to the net contract price of $463,500 (12 months times $38,625 per month). This calculation is the basis of CPI's claim that SMG owed exactly (or at least) nine million records under the contract.

Finally, the contracts differed in price. Despite the fact that SMG's monthly commitment to CPI remained the same, requiring it to provide "up to a maximum of 600,000" records per month, CPI was expected to pay SMG roughly fifty percent more under the Renewal Agreement ($38,625/month) than it had under the Rental Agreement ($25,000/month). Renewal Ag. § V.A.; Rental Ag. § V.A.

The provisions cited above are the foundation for CPI's counterclaims for breach of contract. Additionally, CPI alleges that SMG misrepresented certain key facts in its promotional materials. CPI says it detrimentally relied on these misrepresentations and is entitled to damages as a result. The following excerpts from SMG's marketing brochure are relevant to CPI's position:

---

[2] In this section, both contracts further provide that "[p]ayment terms shall continue to be net ninety (90) days," which the record clarifies to mean that CPI is to pay SMG within ninety days of each of SMG's monthly invoices. Aplt. App. at 27.

Our Preschool, Elementary, Junior High, High School and College-Bound High School Students lists are guaranteed to be 98% accurate.

* * *

No list can be 100% accurate due to constant changes in the population. Each list is guaranteed separately as indicated in this catalog. SMG will refund 15 cents for each piece of undeliverable mail in excess of the guarantee as long as the list is mailed within 30 days of the date you receive the files.

Aplt. App. at 709, 716.

It is undisputed that CPI failed to make the last three monthly payments required under the Renewal Agreement, which gave rise to SMG's suit for breach of contract. Upon initiation of that suit, CPI filed counterclaims against SMG for breach of contract, negligent misrepresentation, and concealment. SMG, in turn, asked the district court for a temporary restraining order to stop CPI's unauthorized use of SMG's lists until a determination on the merits could be reached.

*District Court's Orders*

On June 22, 2004, the district court granted SMG's request for a temporary restraining order and denied CPI's expedited motion for reconsideration. A week later, the district court granted SMG's request for a preliminary injunction (the terms of which were stipulated to by both sides) prohibiting CPI from using or disclosing any of the records it had received from SMG pursuant to the Renewal Agreement and from destroying any documents relevant to the pending litigation.

The injunction was to remain in effect until the court could adjudicate the case on the merits.

During discovery, CPI sought to introduce opinion evidence from two experts to bolster its position that SMG had failed to meet its obligations under the Renewal Agreement. Upon SMG's motion, the district court reviewed the proposed testimony and deemed it inadmissible as failing to meet the reliability requirements of Rule 702 of the Federal Rules of Evidence. CPI maintains this ruling is an abuse of discretion and asks us to reverse the district court on appeal.

On August 22, 2005, the district court granted summary judgment to SMG on all claims and counterclaims, concluding that CPI had failed to present an issue of material fact on any issue. The court ordered CPI to pay $127,462.50 in damages (the three outstanding invoices plus associated late fees) plus attorneys' fees and costs. SMG was given ten days to submit its claim for fees and costs. CPI appealed ("first appeal").

On January 3, 2006, the district court granted SMG's claim for attorneys' fees and costs in the amount of $284,716.30. CPI challenged the award under Rule 59 of the Federal Rules of Civil Procedure, asking the district court to amend the award or, alternatively, to grant a new trial on the issue in the form of an evidentiary hearing. Before the district court ruled, CPI appealed the fees

judgment ("second appeal"). We abated the second appeal pending the district

court's resolution of the Rule 59 motion.[3]

On April 3, 2006, the district court granted in part and denied in part CPI's

Rule 59 motion. Agreeing it had double-awarded certain amounts previously

taxed as costs, the court issued an amended judgment in the amount of

$279,546.98. But the court denied CPI's request for an evidentiary hearing to

resolve several purported factual disputes concerning fees and costs.

On April 12, 2006, we vacated the order abating CPI's second appeal,

consolidated both appeals for procedural purposes only,[4] and ordered briefing to

proceed.

### III. Discussion

The parties raise three issues on appeal: (1) was SMG entitled to summary

judgment on all claims and counterclaims; (2) did the district court abuse its

---

[3] On March 10, 2006, SMG moved to dismiss CPI's first appeal for failure to comply with applicable filing deadlines. CPI had submitted a motion to consolidate both appeals before the deadline, though it should have filed an opening brief in the first appeal at that time. CPI asks us to find the error harmless, stating that its motion to consolidate was intended to stay the briefing schedule until both appeals were ripe for review.

We may permit the first appeal to proceed despite CPI's timing error. Fed. R. App. P. 31(c). While CPI should have filed a clarifying motion, no party was prejudiced by its mistake nor was the court's consideration of the appeal impaired. Furthermore, there is no showing that CPI acted in bad faith. We thus deny SMG's motion to dismiss the first appeal.

[4] We also grant CPI's motion to consolidate both appeals for our disposition of the merits.

discretion by excluding the testimony of CPI's expert witnesses under Rule 702 of the Federal Rules of Evidence; and (3) did the district court abuse its discretion by awarding SMG all the costs and fees it requested without an evidentiary hearing?

### A.  Summary Judgment

CPI contends that the district court improperly granted summary judgment to SMG on its breach of contract claim as well as counterclaims for breach of contract, negligent misrepresentation, and concealment.  The core of CPI's position is that SMG breached its own commitment to deliver the *quantity* and *quality* of names promised under the contract and related promotional materials and, therefore, CPI should be excused from performing its obligation to make the final payments on the contract.

We review the grant of summary judgment de novo.  *Palladium Music, Inc. v. EatSleepMusic, Inc.*, 398 F.3d 1193, 1196 (10th Cir. 2005).  Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "A disputed fact is 'material' if it might affect the outcome of the suit under the governing law, and the dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Schutz v. Thorne*, 415 F.3d

1128, 1132 (10th Cir. 2005). In applying this standard, moreover, "we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Id.* The nonmoving party must nonetheless present "facts such that a reasonable jury could find in [his] favor." *Id.*

With these principles in mind, we address in turn the breach of contract, negligent misrepresentation, and fraudulent concealment claims. Colorado law governs this diversity case. *See* Renewal Ag. § XVII.

*1. Breach of Contract*

It is uncontroverted that CPI failed to remit to SMG the last three payments due under the Renewal Agreement. But CPI claims its performance should be excused because SMG breached the contract first by failing to provide the quantity of student records prescribed by the contract.[5] Specifically, CPI argues the contract required SMG to provide *at least* 9 million student records. Alternatively, CPI argues that the Renewal Agreement stipulated a per-record charge of $0.0515 which it claims it had more than satisfied when the dispute arose.[6]

---

[5] Before the district court, CPI also claimed breach of contract based on SMG's alleged failure to provide the *quality* of names prescribed by the contract. CPI fails to raise this issue on appeal, however, so it is deemed waived. *See, e.g.*, *Gaines-Tabb v. ICI Explosives, USA*, 160 F.3d 613, 624 (10th Cir. 1998) ("[A]rguments not set forth fully in the opening brief are waived.").

[6] The record belies this contention. During the term of the Renewal Agreement, it is uncontested that SMG provided 8,494,066 student records and

(continued...)

-11-

The district court found the quantity and price terms of the Renewal

Agreement to be ambiguous.  On the one hand, the contract provides that SMG

owes CPI "up to 9 million" records over the course of the contract or "up to a

maximum of 600,000" records per month.  Renewal Ag. § I.  On the other hand, it

sets forth a per record charge of $0.0515 which only amounts to the total contract

price ($463,500) when multiplied by nine million names.  Renewal Ag. § V.A.  In

addition, the Renewal Agreement represented a 50% increase in price over the

Rental Agreement, further buttressing CPI's claim that it was entitled to

something "extra" (more names) over the renewal term.

Because of these questions, the district court looked outside the four-

corners of the contract to ascertain CPI's payment obligations under the Renewal

Agreement.  Particularly, relying on evidence of the course of dealing between

SMG and CPI, the district court concluded there was no material dispute that CPI

had breached its duty to make the final three payments under the Renewal

Agreement.

We agree the contract was ambiguous with respect to quantity and, thus, the

district court was entitled to turn to parol evidence to help determine the parties'

intent.  *Boyer v. Karakehian*, 915 P.2d 1295, 1299 (Colo. 1996) ("A court should

_____

[6](...continued)
that CPI paid nine months of invoices totaling $347,625 (9 x 38,625).  However,
when the purported per-record charge of $0.0515 is multiplied by 8,494,066
records, the total price is $437,444.39.  Thus, even under CPI's argument, it
underpaid SMG by $89,819.39 ($437,444.39 – $347,625).

-12-

only admit parol evidence when the contract between the parties is so ambiguous that their intent is unclear.").

The record reflects that, up until the time of the dispute and including the term of the Rental Agreement, CPI had consistently made flat monthly payments that did not vary depending on the relative number of addresses SMG happened to provide each month. Under the Renewal Agreement, SMG billed CPI monthly for $38,625 for 12 months, and CPI paid nine months of invoices without raising any concerns about the price, quantity, or quality of the names. The parties conduct shows CPI's obligation was to make monthly payments of $38,625, regardless of the exact number of names supplied in a particular month.

In the face of these facts, CPI argues:

The fact that College Partnership paid for 9 months of invoices before realizing that the number of names was not on target to reach 9 million names and that the billings were on a monthly basis only indicates that College Partnership trusted that it would receive the promised number of names (and therefore SMG would be entitled to full payment) until the deficiencies became obvious. The court improperly gave SMG an inference to which it was not entitled.

Aplt. Br. at 23.[7] This contention is unpersuasive for several reasons.

_____

[7] Even if we were to accept CPI's logic, it was not up to the company to devise its own remedy for SMG's alleged breach. The Renewal Agreement delineated appropriate avenues for either party in case of breach:

Lessee shall be in default upon any failure to pay the monthly installments due hereunder within ten days of the due date thereof. Either party shall be in default upon the occurrence of any one of the following events: (1) breach or failure by such party to perform any

(continued...)

-13-

First, as we discussed, the parties' course of dealing contemplated a monthly flat fee, regardless of the exact number of names supplied in the month. The contract itself does not provide an express commitment to a particular quantity. Under the heading "Rental of High School Records," it states: "SMG hereby rents to Lessee up to 9 MILLION (9,000,000) High School Records during the term of this Agreement," Renewal Ag. § I., with no particular commitment that SMG would provide a specific quantity.

Second, the parties understood the quantity would vary because CPI targeted different geographical locations throughout the year and individual mailings would reflect that business strategy. Obviously some geographical locations would generate more names than others, as would CPI's decision to target a location several times throughout the year. The evidence shows, moreover, that SMG provided 8,494,066 records over the course of the year at issue, and the monthly variations in names supplied confirm the parties' practices under the contract.

---

[7](...continued)
other term, condition or covenant of this Agreement and such breach or failure shall continue uncured for a period of thirty days after receipt of written notice thereof . . . .

Renewal Ag. § X. It is undisputed that on June 2, 2004, SMG notified CPI of its delinquency on the March 2004 invoice, thereby adhering to the contract's default guidelines. Aplt. App. at 36. In response, and for the first time, CPI argued it was entitled to credits in an amount exceeding that which SMG claimed it owed. *Id*. at 38.

Both the Rental and Renewal Agreements were clear that SMG "shall" provide "up to a maximum of 600,000 High School Records" per month and CPI does not claim SMG breached this commitment. When this monthly maximum is multiplied by 12 months, moreover, the product is only 7.2 million, belying CPI's claim that SMG owed at least 9 million records under the contract.[8] In fact, CPI knew at the time of renewal that SMG had a database of 5.7 million names and expected to add up to 2 million new names.

In sum, we agree with the district court that SMG's quantity obligation was not fixed in absolute numerical terms, but rather subject to a cap of nine million records over the course of the agreement. The course of dealing between the parties shows CPI owed a duty to make twelve monthly payments of $38,625 over the contract term ($463,500 total) irrespective of the precise number of records provided by SMG each month.

*2. Negligent Misrepresentation*

CPI's next contention is that SMG negligently misrepresented material facts regarding quantity and quality when it entered into the contract with SMG. Specifically, CPI points to two parts of the deal: (1) SMG's representation in the Renewal Agreement that it had a database of 5.7 million records and was

---

[8] The 600,000 per month maximum is clearly inconsistent with the 9 million per year term regardless of how the latter is construed. Nevertheless, we agree with the district court's determination that the obvious construction of the contract was that 9 million represented a ceiling and not a floor.

undertaking to add one to two million more, and (2) SMG's statement in its marketing brochure that its database was 98% accurate.

Under Colorado law, negligent misrepresentation consists of negligently providing false information on which others justifiably rely to their detriment:

> The tort of negligent misrepresentation provides a remedy when money is lost due to misrepresentation in a business transaction. To establish a claim for negligent misrepresentation, it must be shown that the defendant supplied false information to others in a business transaction, and failed to exercise reasonable care or competence in obtaining or communicating information on which other parties justifiably relied.

*Mehaffy, Rider, Windholz & Wilson v. Central Bank, N.A.*, 892 P.2d 230, 236 (Colo. 1995) (internal citations omitted); s*ee also Keller v. A.O. Smith Harvestore Prods., Inc.*, 819 P.2d 69, 74 (Colo. 1991).

First, we find CPI's negligent misrepresentation claim as to quantity unavailing. In light of SMG's delivery of over 8 million student records under the Renewal Agreement, the district court correctly concluded that the quantity representation did not establish a misrepresentation. In its brief, CPI says that SMG represented it "had a database containing 5.7 million names and was undertaking efforts to add 1 to 2 million additional names [] *so that 9 million unique or updated student records could be delivered*." Aplt. Br. at 25.

But SMG represented only that its database contained 5.7 million names and that it "anticipate[d] compiling an additional 1–2 million records by June 2004." Renewal Ag. § IV.C. SMG did not explicitly link its intention of

-16-

expanding its database with any promise to provide exactly 9 million names. Since reasonable reliance is a *sine qua non* of a negligent misrepresentation claim, *see e.g.*, *Mehaffy*, 892 P.2d at 236, CPI has failed to present an issue of material fact as to a claim of misrepresentation on quantity.

Second, we conclude SMG's 98% accuracy guarantee (made in its marketing brochure) is also not a sound basis for a negligent misrepresentation claim. As an initial matter, SMG suggests the claim cannot stand in the face of its fully integrated contract with CPI, in which SMG specifically disclaimed any representations as to accuracy.

The interplay between an integrated business contract and a claim for negligent misrepresentation was explored most extensively by the Colorado Supreme Court in *Keller*. In that case, the court concluded that a cause of action for negligent misrepresentation could go forward against a manufacturer for representations it made during the course of negotiations, despite the execution of a fully integrated sales agreement. "A contract provision purporting to prohibit a party to [a] contract from asserting a claim of negligent misrepresentation must be couched in clear and specific language." 819 P.2d at 74. The contract provision at issue provided:

> [Buyer has] read and understood the terms and conditions of this purchase order including the warranties, disclaimers and terms and conditions herein given to me, either by the manufacturer or the seller. [Buyer relies] on no other promises or conditions and regards that as reasonable because these are fully acceptable to [Buyer].

-17-

*Id.* Construing this language, the court concluded that it "does not clearly and specifically disclaim reliance . . . on all representations . . . prior to the execution of the contract." *Id.* Finding the contract language lacked the requisite specificity, the court allowed a claim for negligent misrepresentation to go forward.

We conclude that the Renewal Agreement's waiver and integration clauses contain the kind of "specific language" necessary to preempt CPI's negligent misrepresentation claim as a matter of law. First, the warranty clause provided that "neither the accuracy nor the completeness of the information provided to lessee under this Agreement is guaranteed." Renewal Ag. § VII. The accuracy of student records is precisely what CPI claims SMG negligently misrepresented. Second, and unlike *Keller*, here the integration clause is specific and unambiguous. It provides:

> Entire Agreement. This agreement and the confidentiality agreement including without limitation, any and all exhibits and attachments to either such agreement, constitute the entire agreement between the parties hereto and supersedes all previous agreements and understandings, whether oral or written, express or implied . . . .

Renewal Ag. § XX. Third, the Renewal Agreement contains a broad limitation on tort and negligence liability, § VIII.B., as well as a broad disclaimer of

warranty. *Id.* at § VII. In these circumstances, CPI could not reasonably claim that it relied on the prior representations about SMG's database.[9]

Even if the integration clause and other contract terms were insufficiently specific, summary judgment was still proper because the 98% accuracy guarantee was accompanied by a refund policy that CPI could have used, but did not.

SMG's marketing brochure "guaranteed" 98% accuracy. But the guarantee was accompanied by a refund policy that promised to refund undeliverable mail in excess of 2%. The refund policy, as it appears in SMG's brochure, provides:

> No list can be 100% accurate due to constant changes in the population. Each list is guaranteed separately as indicated in this catalog. [The college-bound lists at issue in this case promised 98% accuracy.] SMG will refund 15 cents for each piece of undeliverable mail in excess of the guarantee as long as the list is mailed within 30 days of the date you receive the files.

---

[9] This conclusion is consonant with our reasoning in *Brooks v. Timberline Tours*, 127 F.3d 1273, 1276 (10th Cir. 1997), which analyzed *Keller* to mean that a general integration clause is not *sufficient* to bar a claim for negligent misrepresentation. However, additional contractual disclaimers—such as an exculpatory clause in that case and the warranty and liability limitation clauses in the instant case—could suffice:

> *Keller* does not hold that negligent misrepresentation claims cannot be waived by an exculpatory agreement. Keller only holds that "the mere presence of a general integration clause in an agreement does not bar a claim for negligent . . . misrepresentation." *Keller*, 819 P.2d at 73 (citations omitted). A negligent misrepresentation claim can still be barred by an exculpatory agreement prohibiting such tort claims. Under the *Keller* reasoning, although the integration clause in the disputed agreement does not bar Plaintiffs' negligent misrepresentation claims, the release provision does bar their claims.

Aplt. App. at 716. Thus, the guarantee expressly provided a remedy for undeliverable mail—any undeliverable mail in excess of the guarantee would be eligible for a refund. In this way, the refund forms an inextricable part of the guarantee.

CPI never took advantage of the refund offer—its remedy for undeliverable names in excess of 2%. CPI contends the refund offer was worthless given the cost of exercising the option. Nevertheless, it cannot claim reliance on the 98% guarantee while dismissing the refund opportunity underlying the guarantee. In short, it was unreasonable for CPI to selectively rely on one half of the guarantee but not the other.

We thus agree with the district court that CPI has failed to raise a genuine issue of material fact on the negligent misrepresentation issue.

*3. Fraudulent Concealment*

Finally, CPI contends SMG fraudulently concealed facts which would preclude SMG from satisfying its obligations under the Renewal Agreement in two ways: (1) SMG would not be able to expand its database by 1–2 million student records as promised because it had entered into consent decrees which required it to delete millions of records from its database, (2) SMG could not

-20-

satisfy the 98% guarantee set forth in its promotional materials because its records had alleged delivery failure rates of 5%.[10]

To prevail on a claim for fraudulent concealment under Colorado law, a plaintiff must demonstrate: (1) the defendant failed to disclose a past or present fact that (2) he or she had a duty to disclose, (3) with intent to induce plaintiff to take a course of action he otherwise would not have taken and (4) plaintiff justifiably relied on the omission. *Wisehart v. Zions Bancorporation,* 49 P.3d 1200, 1204 (Colo. App. 2002).

CPI's evidence of fraudulent concealment regarding the quantity representation was based on several consent decrees entered into by SMG in other matters. The decrees required SMG to delete certain student records from its database. CPI contends this demonstrates that from the beginning SMG knew it could not meet its commitment of adding 1–2 million names to its database. The district court granted summary judgment because (1) the contractual language reflects merely an *anticipatory* commitment to add 1–2 million new names, and (2) SMG disclosed the existence of the consent decrees to CPI. We agree.

As an initial matter, the Renewal Agreement includes no firm commitment to add 1–2 million records, stating only SMG "*anticipates* compiling 1–2 million additional names." Renewal Ag. § IV.C. (emphasis added). Moreover, this

---

[10] CPI's delivery rate computation is based on a computer program called CASS, which checks addresses in direct mail lists against addresses recognized by a United States Post Office database.

aspirational language was even surpassed by SMG's performance under the contract. SMG provided almost 8.5 million records, which is 800,000 more than the ceiling set by the anticipatory commitment in the first instance. Because the consent decrees had no effect on SMG's obligations under the contract, SMG was under no duty to disclose them.[11]

CPI's second basis for fraudulent concealment relates to SMG's purported 98% accuracy guarantee. CPI contends that SMG should have disclosed the mailing lists had delivery failure rates of 5% according to the CASS program. The district court concluded the CASS rates are not a reliable proxy for accuracy. We also agree on this point.

SMG's 98% accuracy guarantee is one of deliverability: i.e., a representation regarding the proportion of student addresses to which CPI's mailings will actually be delivered. CASS, however, marks as "inaccurate" or "undeliverable" any address that has any error, no matter how slight (e.g., if the "Smith *Road*" is represented as "Smith *Street*"); thereby weeding out as unreliable many student records to which mail will likely be delivered. In other words, the CASS certification rate necessarily represents a narrower subset of records than

---

[11] CPI implies SMG's commitment was to provide 1–2 million *new* student records, rather than updated or duplicate records. But the record rebuts this contention in two ways. First, CPI conceded that it regularly asked for names in the same zip code more than once. Aplt. App. at 747. Second, the contract was explicit that SMG could fulfill its quantity commitment with new *or* updated, duplicate names. *See Renewal Ag.* at 3 ("Monthly deliveries may contain either new or updated duplicate High School Records.").

those actually delivered.  Since CASS data is the only evidence of reliability proffered by CPI, the district court correctly concluded the CASS certification rate is not sufficient to support the concealment claim.[12]

Because CPI has failed to raise an issue of material fact with respect to its fraudulent concealment claim, we affirm the district court's grant of summary judgment.

##### B.  Exclusion of Expert Testimony

CPI asserts the district court abused its discretion by excluding the bulk of the testimony of its experts, Nathan Allen and Thomas Hiller.  After an exhaustive review, the district court rejected the testimony as not sufficiently reliable under Rule 702 of the Federal Rules of Evidence and, thus, inadmissible. The question here is whether the district court adequately performed its gatekeeping role pursuant to the standards set forth in *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993). We conclude that it did.

"Under Rule 702, a district court must satisfy itself that the proposed expert testimony is both reliable and relevant, in that it will assist the trier of fact, before permitting a jury to assess such testimony." *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1122–1123 (10th Cir. 2006).  In determining whether expert testimony is "both reliable and relevant," our case law requires the district court

---

[12]  In fact, CPI's own experts admitted that a CASS failure does not necessarily mean an address is undeliverable.  August 22, 2005 Order at 31.

to undertake a two-step analysis. First, the court must determine whether the expert is *qualified* to render an opinion. Second, if the expert is sufficiently qualified, the court must determine whether the expert's opinion is *reliable* under the principles set forth in *Daubert*. *103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006).

The methodology we use to assess reliability includes (1) whether the proffered theory can and has been tested; (2) whether the expert's opinion has been subject to peer review; (3) the known or potential rate of error; and (4) the general acceptance of a methodology in the relevant scientific community. *Daubert*, 509 U.S. at 593–94. Reliability questions may concern the expert's data, method, or application of the method to the data. "Under *Daubert*, any step that renders the expert's analysis unreliable . . . renders the testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology." *Mitchell v. Gencorp Inc.* 165 F.3d 778, 782 (10th Cir. 1999). Finally, it should be noted that the proponent of expert testimony bears the burden of showing that its proffered expert's testimony is admissible. *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 n.4 (10th Cir. 2001). We review de novo *whether* the district court performed its role as gatekeeper in admitting or excluding expert testimony, and we review for abuse of discretion *the manner in which* the district court performs this role. *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1223 (10th Cir. 2003) ("Though

the district court has discretion in how it conducts the gatekeeper function, we have recognized that it has no discretion to avoid performing the gatekeeper function."). Provided the district court performs the role, we will not disturb its ruling absent our conviction that it is "arbitrary, capricious, whimsical or manifestly unreasonable." *Goebel v. Denver & Rio Grande Western R.R.*, 346 F.3d 987, 990 (10th Cir. 2003) (internal citations omitted).

CPI proffered two experts. One was a computer programmer specializing in direct mail marketing and the other a professional working in direct mail marketing and information management. The computer programer, Nathan Allen, analyzed lists used by CPI over a 23-week period in 2004 to "compile statistics on the reliability, deliverability and duplication" present in the lists provided by SMG. He analyzed over 8 million records from CPI's various vendors, including approximately 1.3 million records from SMG. The aim was to test SMG's claims, displayed in its promotional materials, that its records were "98% accurate."

After completing his study, Allen forwarded his findings to the direct mail expert, Thomas Hiller, for further analysis. Hiller sought to ascertain the relative and absolute number of incorrect addresses in each vendor's mailing list. He concluded that SMG's lists were the worst performing of the bunch. In addition, Hiller reviewed SMG's promotional materials to ascertain whether its 98% guarantee was feasible in light of his general knowledge of mailing list management techniques. He concluded it was not.

Applying the gatekeeper role explained in *Dodge*,[13] the district court conducted a careful review of the testimony CPI sought to admit and concluded that Allen's study was not reliable enough to satisfy Rule 702. Likewise, it excluded the portion of Hiller's testimony that sought to expound on Allen's study for the same reason. We agree with this assessment for several reasons.

First of all, the SMG lists Allen analyzed for purposes of the litigation were not, in fact, the original lists provided by SMG to CPI. Upon receiving lists from its various vendors, CPI promptly forwarded them to a contractor called PrimeNet whose job was to integrate the lists into a single database for CPI's use. During the integration process, PrimeNet removed duplicate names and addresses, checked that addresses were deliverable, and assigned a code to each record to enable CPI to track the vendor source of each name.

In his deposition, Hiller testified he had detected potential inaccuracies in the way PrimeNet coded the lists with the consequence that an untold number of records may have been attributed to the wrong source. Neither expert attempted to quantify the impact of PrimeNet's modifications on Hiller's assessment of SMG's lists, thus inserting an unknown error rate into the analysis. As a result, the district court concluded the data used was "an unworkable proxy for SMG's lists"

---

[13] "It is by now well established that [Rule] 702 imposes on a district court a gatekeeper obligation to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *Dodge*, 328 F.3d at 1221 (quoting *Daubert*, 509 U.S. at 589).

such that "this means these experts cannot vouch for the reliability of their own data." December 28, 2005 Order at 13.

In addition, Allen compared a January 2004 mailing list against a December 2004 address database. The CASS system uses a database of validated United States Postal Service addresses which are updated monthly. Hiller's conclusions regarding the viability of SMG's marketing promises hinged on census data showing that 3.9% of the population moves quarterly. Because SMG admits to updating its lists only quarterly, Hiller concluded the 98% reliability guarantee was implausible. But as the district court found, Allen's CASS analysis contained an important flaw:

> [A]ssuming the lists were 100% accurate when SMG provided them to CPI, using a CASS update eleven months later would likely mean that more than 10% of the addresses would be incorrect. In effect, Allen's review measured how accurate an SMG list is eleven months after it is provided, while the relevant inquiry is how accurate the lists are within 30 days of when they are provided, which is SMG's guarantee. Neither Allen nor Hiller addresses this issue.

*Id.* Thus, the information on which both experts intended to rely lacked sufficient indicia of reliability to meet the *Daubert* standard.

"[W]e are concerned with the trial court's performance of its obligation under Rule 702 and *Daubert*, not upon the exact conclusions reached to exclude or admit expert testimony." *Bitler v. A.O. Smith Corp.*, 391 F.3d 1114, 1119 (10th Cir. 2004):

-27-

Thus, although the district court "must, on the record, make some kind of reliability determination," *United States v. Velarde*, 214 F.3d 1204, 1209 (10th Cir. 2000), "we recognize the wide latitude a district court has in exercising its discretion to admit or exclude expert testimony."

*Id.* Under this standard, the district court did not abuse its discretion in excluding the expert testimony.

#### C. Attorneys' Fees

Finally, CPI contends the district court erred in awarding attorneys' fees and costs to SMG without an evidentiary hearing. CPI claims it proffered affidavits that established substantial factual disagreements as to the reasonableness of the number of hours billed and the hourly rates charged by SMG's counsel. As a result, CPI claims an evidentiary hearing was required under Colorado law.

The determination of reasonableness and amount of attorneys' fees—and whether an evidentiary hearing would be helpful in its analysis—is generally left to the sound discretion of the district court. *Harris Mkt. Research v. Marshall Mktg. & Comm., Inc.*, 948 F.2d 1518, 1527 (10th Cir. 1991). Where attorneys' fees are governed by contract (as they are in this case), the district court has "far less equitable discretion" than in cases where fees are subject to a fee-shifting statute. *United States ex rel. C.J.C., Inc. v. Western States Mech. Contractors, Inc.*, 834 F.2d 1533, 1549 (10th Cir. 1987). In a contract fee case, the district court is merely expected to enforce the bargain and "make the non-breaching party whole." *Id.* at 1547. Discretion of the court is therefore limited such that "fees

-28-

are routinely granted and [contracts] enforced according to [their] terms." *Id.* at 1548. Unlike in the case of a fee-shifting statute, "the trial court is not responsible for independently calculating a 'reasonable' fee" and should only reject the contractually-stipulated award if it is "unreasonable or inequitable." *Id.* at 1549–50.

As to the need for an evidentiary hearing to help resolve the fees issue, the court must determine whether "it has sufficient knowledge to make a decision without a hearing based on its experience with the case, and briefs and affidavits submitted by the parties." *Gamble, Simmons & Co. v. Kerr-McGee Corp.*, 175 F.3d 762, 774 (10th Cir. 1999). We review this determination for abuse of discretion, and will not reverse unless we have "a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Moothart v. Bell*, 21 F.3d 1499, 1504 (10th Cir. 1994).

CPI cites several reasons why the district court abused its discretion. First, it claims it was entitled to an evidentiary hearing in order to clarify the testimony of its fees expert, which the district court discounted as too "conclusory." Aplt. Br. at 34. But we agree with the district court that "the desire to make a more persuasive case in a hearing is not the kind of 'clear error' or 'manifest injustice'" requiring a hearing. April 3, 2006 Order at 4–5. In fact, the parties had ample opportunity to submit supporting materials for their respective positions, and it is

-29-

obvious from the district court's order that it carefully reviewed all of the proffered materials.

Second, CPI claims an evidentiary hearing was required to develop the record as to the reasonableness of hourly rates and certain costs billed under general headings like "employee overtime," "word processing," etc. Aplt. Br. at 35. In particular, it argues the court erred by (1) ignoring its claim that SMG used "scorched earth" tactics to drive up the expense of litigation; (2) disregarding evidence that SMG's counsel and paralegal rates were "far in excess" of prevailing national rates; (3) deferring to SMG's choice of Pennsylvania counsel over its local (less expensive) Denver counsel, and (4) "abandon[ing] its role of considering the reasonableness of costs that SMG claimed."[14] Aplt. Br. at 36–38. But the district court considered these claims and found them wanting as a matter of fact. On the basis of substantial documentation from SMG on fees and costs, the court concluded, "CPI did not provide any evidence or argument that persuaded me that this documentation was incomplete or inaccurate." April 3, 2006 Order at 5.

Finally, CPI argues that the fees award in this case should be discounted because of SMG's litigation tactics. The district court did not agree and CPI has

_____

[14] CPI posts a laundry list of the allegedly stray costs—items such as printing, copies, telephone—and takes issue with the fact that SMG offered no "explanation of the purpose of these costs." Aplt. Br. at 37. But all the costs listed are precisely the kind you would expect to flow from litigation and none is particularly excessive.

not demonstrated on appeal that this case is atypical of commercial litigation generally, or that it involved especially sharp or aggressive practices. Civility should be a part of every lawyer's arsenal, and we lament its absence here. But CPI neither made the case nor does the record support a finding that SMG acted in malice or bad faith. In fact, SMG offered to settle before filing a lawsuit and won on a motion for summary judgment. CPI, moreover, does not make an argument on appeal that these tactics caused the overall number of hours billed to the case by either local or outside counsel to be excessive. The fact that SMG used out-of-state counsel (which it had previously retained) does not militate in favor of discounting fees, certainly not in a federal civil action with a complicated procedural history and substantial record.

In sum, on this record we conclude the court did not abuse its discretion in denying an evidentiary hearing on fees and costs or in making the award it did.

### IV. Conclusion

For the reasons stated above, we AFFIRM the decisions of the district court in all respects.

Entered for the Court

Timothy M. Tymkovich
Circuit Judge

No. 05-1427, *Student Marketing Group, Inc. v. College Partnership, Inc.*

**HOLLOWAY**, J., concurring in part and dissenting in part:

I concur in Parts III-A-3 and III-B of the Order and Judgment. I dissent from Parts III-A-1 and III-A-2, because I conclude that the district judge erred in granting summary judgment for plaintiff-appellee Student Marketing Group on the counter-claims of defendant-appellant College Partnership, Inc. for breach of contract and negligent misrepresentation. Because I would reverse and remand on this basis and because this would require vacating the award of attorneys' fees, I do not join Part III-C of the Order and Judgment.

## I

On the breach of contract counterclaim, I agree with the majority and with the district judge that the Renewal Agreement is ambiguous on the subject of the number of records that Student Marketing was obligated to provide for the more than 50% increase in price that it was charging over the previous year's rate. Unlike the majority, however, I believe that resolution of this ambiguity on summary judgment was improper here.

College Partnership paid a flat monthly charge for the first nine months of the term of the renewal agreement and did so without complaint about price, quantity or quality of names. This shows, the majority asserts, that College Partnership was bound to make these monthly payments no matter how many (or how few) names were provided. This is simply a *non sequitur*, in my view. Indeed, taken at face value, it means that if Student Marketing had *decreased* the

number of names provided from the initial year (say from 7.2 million to 72) instead of increasing the number as promised, College Partnership would still have been obligated to pay at the substantially higher rate called for in the renewal agreement. I think this a patently unreasonable reading of the Renewal Agreement, and yet I see no way that this implication can be avoided consistently with the majority's interpretation of the contract. And I certainly cannot agree with the conclusion that this result was properly reached via summary judgment, when a much more reasonable construction of the contract is also possible.

Moreover, even if I were to overlook this troubling implication of the majority's holding, the reasoning is unpersuasive. The majority notes College Partnership's argument that the monthly payment arrangement only reflects College Partnership's trust that Student Marketing would in fact provide nine million records before the year was up, followed by the eventual realization that its trust had been misplaced. This, I think, is a reasonable inference and alone should defeat summary judgment.

To rebut this contention, the majority first makes a merely circular argument, stating that the contract did not provide an express commitment for Student Marketing to provide a certain number of names. The original task was to resolve the ambiguity of whether or not the contract called for Student Marketing to provide nine million names, or only *up to* nine million. In trying to resolve this ambiguity, the majority follows Student Marketing's suggestion to look at the

requirement for payment in fixed amounts. In considering the implications of that requirement, the majority finds that it shows that the promise was only to provide up to nine million names because the contract did not say otherwise.

So, in other words, the majority sets out to decide what the ambiguous phrase "up to nine million names" means. But when College Partnership gives one reason why it might mean a minimum of nine million names, the court rejects this possibility because the contract does not expressly require Student Marketing to provide nine million names. This begs the question and so proves nothing at all.

Next, the majority notes evidence that the parties understood that the quantity of names provided would vary from month to month, even though the payments were to be a fixed amount each month. But again, I think that it is a *non sequitur* to say that this shows that the parties had not agreed that Student Marketing would, by the end of the contract year, provide nine million names. It simply is not the case that the payment arrangement supports only inferences favoring Student Marketing.

In sum, I would reverse the district court's grant of judgment as a matter of law to Student Marketing on College Partnership's counterclaim for breach of contract.

## II

I would also reverse the district court's grant of summary judgment to Student Marketing on College Partnership's counterclaim for negligent

misrepresentation. My first point of disagreement with the majority in its analysis of this claim is on the issue whether College Partnership's negligent misrepresentation claim may be maintained notwithstanding the renewal agreement's integration clause and limitation on consequential damages. Colorado law applies in this diversity case, and it sets a high standard for contractual language to be effective in barring tort claims.

The leading Colorado case is *Keller v. A.O. Smith Harvestore Products*, 819 P.2d 69 (Colo. 1991). That case held that a negligent misrepresentation claim could be maintained in spite of the contract's integration clause, which included this language: Buyer relies "on no other promises . . . ."

The district court said that the language in the renewal agreement at issue in this case was "similar to the provision in *Keller*" and so insufficient to bar a claim for negligent misrepresentation. Without mentioning this ruling by the district judge, the majority reaches the opposite conclusion.

The Renewal Agreement at issue in the present case (as quoted in the majority's order at 18), includes a statement that the accuracy of information is not guaranteed. Similarly, in *Keller*, the contract provided that the advertisements, brochures, written and oral statements "are not guarantees . . . ." 819 P.2d at 74. The Renewal Agreement in our case contains an integration clause, which the majority quotes and relies upon, that says that the written agreement "supersedes

all previous agreements . . . ." In *Keller* (as already noted and as quoted in the majority's order) the contract said [Buyer relies] on no other promises . . . . ." *Id.*

The majority also notes that the Renewal Agreement in this case "contains a broad limitation on tort and negligence liability . . . ." But the majority cites no Colorado law regarding the effect of the limitation. *More importantly*, the majority does not mention the fact that the provision referred to limits consequential *but not direct* damages, a distinction that the district judge found material, as I do.

The majority unavailingly cites *Brooks v. Timberline Tours*, 127 F.3d 1273, 1276 (10th Cir. 1997), as further support for the holding that the Renewal Agreement effectively bars the negligent misrepresentation claim. But the language in *Brooks* is much more specific, detailed, and comprehensive than the language at issue here. The contract there included an express release of almost any conceivable claim. And in the portion of *Brooks* that addressed the negligent misrepresentation claim and the reliance on *Keller*, this court said specifically that although the integration clause did not bar the claim, the release did. 127 F.3d at 1276. I agree with the district court that the release language in *Brooks* was "more sweeping and specific." (Again, the majority simply does not mention this holding of the district court, much less attempt to show why it is rejected.)

The majority goes on to hold that Student Marketing would be entitled to summary judgment on the negligent misrepresentation claim on the alternative

-5-

ground that the 98% accuracy provision of the Renewal Agreement was accompanied by a remedial (refund) provision, which College Partnership had not attempted to employ. Although the refund offer was – to those in the business – transparently worthless because it would cost more to avail oneself of the remedy than would be recouped, the majority nonetheless declares – as a matter of law but without citation of authority – that College Partnership cannot claim to have relied on the representation that the lists would be 98% accurate "while dismissing the refund opportunity underlying the guarantee."

College Partnership, however, adduced evidence that it did rely on the promise, even though it knew that the refund provision was worthless as a practical matter.[1] I am aware of no Colorado law that makes the presence of an

---

[1]The district court held that College Partnership's reliance was unreasonable as a matter of law because that court concluded that College Partnership's own expert, Mr. Hiller, testified that the guarantee taken in its entirety was not misleading and would not be to companies in the industry. I believe that the district court erred by construing ambiguous evidence against College Partnership on summary judgment. Mr. Hiller was asked whether "to anyone in the industry that knows what they are doing, it's not a misleading guarantee, is it?" Mr. Hiller answered "No." But from the context of the testimony, it is not entirely clear what the witness meant, and this is especially so because Mr. Hiller almost immediately thereafter said, "But the 98 percent is misleading." III Aplt. App. 821. I believe that the testimony was ambiguous because Mr. Hiller, who was not a lawyer, appears to have been addressing the refund remedy, rather than the guarantee of accuracy, in the portion of his testimony on which the district court relied. But his statement that the promised 98 per cent accuracy was misleading quite clearly addresses and supports the precise point put in issue in the negligent misrepresentation counterclaim. The ambiguity is, to me, sufficiently apparent to require considering that interpretation of the testimony on summary judgment.

illusory contract remedy an affirmative defense to the tort of negligent misrepresentation.

In conclusion, I am persuaded that the district court erred in granting summary judgment on the breach of contract and negligent misrepresentation counterclaims, and I would reverse and remand for the reasons given.