The PEOPLE of the State of
Colorado, Complainant

v.

Brandon S. CULTER, Respondent.

No. 10PDJ099.

Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.

Nov. 18, 2011.

---

## OPINION AND DECISION IMPOSING SANCTIONS PURSUANT TO C.R.C.P. 251.19(b)

### I. *SUMMARY*

Respondent, an estate planning attorney, solicited and accepted loans from clients without recommending they seek independent legal advice or obtaining their written consent to the transactions. Respondent stipulated that this conduct violated Colo. RPC 1.8(a). The People also allege Respondent misrepresented facts regarding the loan transactions to his clients in violation of Colo. RPC 8.4(c). We agree that Respondent misrepresented his intended use of a loan to one client, but we disagree with the People's contention that Respondent was dishonest toward other aggrieved clients. We conclude the appropriate sanction is a six-month suspension, all stayed upon the successful com-

pletion of a three-year period of probation with conditions.

## II. *PROCEDURAL HISTORY*

The People filed a complaint in this case on September 21, 2010, alleging Respondent violated Colo. RPC 1.8(a) and 8.4(c). Respondent answered on November 9, 2010. On August 11, 2011, the parties filed a "Stipulation Regarding Claim I of the Complaint," in which Respondent admits he violated Colo. RPC 1.8(a). The PDJ approved the stipulation on August 26, 2011.

During the hearing on September 20, 2011, the Hearing Board heard testimony from Respondent, Dustin Lindsey, Kenneth C. Landers Jr., and Walter Hopp and considered the People's stipulated exhibits 1–9 and 12–21, the People's exhibit 16B, Respondent's stipulated exhibits A–G, and Respondent's exhibits H–I.[1]

## III. *FINDINGS OF FACT AND RULE VIOLATIONS*

Respondent took the oath of admission and was admitted to the bar of the Colorado Supreme Court on October 21, 1993, under attorney registration number 23141.[2] He is thus subject to the jurisdiction of the Colorado Supreme Court and the Hearing Board in these disciplinary proceedings.[3]

### Background

After having worked at several law firms, Respondent opened his own law office in 2004. He hired Jamie Bates ("Bates") as an associate in 2006 and formed a partnership with Bates the next year. Respondent and Bates employed an associate, two legal assistants, and a part-time clerical assistant.

Respondent's partnership with Bates lasted only from March 2007 until July 2007, when Bates abruptly left the firm.[4] Respondent was caught off-guard by Bates's departure, which he discovered upon arriving at work one morning to find Bates's computer and client files missing. Respondent continued to operate the firm until December 2008, when he accepted an of-counsel position with Donelson Ciancio & Goodwin, PC.

After his 2003 divorce from his first wife, Respondent kept and continued to live in their home in Superior, Colorado. The house was encumbered by deeds of trust securing two mortgages for $297,050.00 and $97,600.00, respectively.[5] In March 2007, Respondent conveyed the house into the Brandon Culter Trust ("Culter Trust"), a revocable trust he had formed in 2005.[6]

In June 2007, facing financial pressures relating to his divorce and the recent expansion of his law practice, Respondent borrowed $30,000.00 from Timothy R. Cook ("Cook").[7] The loan, which relates only indirectly to the allegations in this matter, was secured by a third deed of trust on Respondent's house.[8] Respondent testified, however, that he had accrued about $75,000.00 in equity in the house by August 2007.

Respondent remarried in October 2007. Since early 2010, he has practiced law independently from his home.

### Lindsey Loan

■ Respondent provided estate planning services to Dustin and Barbara Lindsey ("Mr. and Mrs. Lindsey," collectively, "the Lindseys") on a periodic basis beginning in 2002.[9] In 2007 and 2008—the timeframe of the loans at issue here—an associate in Re-

---

1. In assessing the testimony and evidence presented in this matter, the Hearing Board is governed by C.R.C.P. 251.18(d), which provides in part that "proof shall be clear and convincing evidence."

2. Respondent's registered business address is 12303 Airport Way, Suite 200, Broomfield, Colorado 80021.

3. *See* C.R.C.P. 251.1(b).

4. *See* Stipulation Regarding Claim I of the Compl. ("Stip.") ¶¶ 1(k)-(*l*).

5. Ex. 9.

6. Exs. 7–8.

7. Ex. 1.

8. Exs. 1, 9.

9. Stip. ¶ 1(c).

spondent's firm performed approximately $1,000.00 in legal services for the Lindseys.[10]

Respondent and Mr. Lindsey, a retired alpaca rancher and construction company owner, skied and played golf together from time to time. In some instances, their outings were part of group events sponsored by Merrill Lynch, to which both men had a connection. Respondent stayed at least once at the Lindseys' second home in Vail, and he considered Mr. Lindsey a friend. Mr. and Mrs. Lindsey both attended Respondent's 2007 wedding, but Respondent did not have an independent friendship with Mrs. Lindsey. Mr. Lindsey characterized his relationship with Respondent as "a friendly relationship that was based on business."

In the face of mounting financial pressures, and knowing the Lindseys had previously loaned money to friends, Respondent asked Mr. Lindsey for a loan of $168,000.00 around July 30, 2007. He explained to Mr. Lindsey that he was having trouble paying salaries and rent for his firm's office space in the wake of Bates's departure. Respondent testified that he did not anticipate having trouble repaying the loan because his firm had been grossing $45,000.00 to $50,000.00 per month before Bates left and he believed the firm could return to that level of profitability. Mr. Lindsey responded by email to Respondent's entreaty, saying the Lindseys would "be happy to help," noting that the transaction should be "discreet,"[11] and assuring Respondent, "As to terms, repayment, interest rate and all, we'll work something out."[12]

Respondent concedes he did not advise the Lindseys to seek independent advice regarding the loan, obtain their written consent to the transaction, or inform them about his indebtedness to Cook or his general creditworthiness.[13] He knew, however, that the Lindseys had wealth management advisers from whom they could solicit advice and that Mrs. Lindsey—who had worked as an accounting manager for several companies, including Yahoo—was financially savvy. Mr. Lindsey, for his part, did not doubt Respondent would repay the loan, so he did not deem any additional information necessary before agreeing to the transaction.[14] Mr. Lindsey had trusted Respondent enough to continue to retain him for estate planning services when he moved from one law firm to another, and Mr. Lindsey generally considered Respondent a "good guy."

Whether Respondent agreed to provide security for the Lindseys' loan is disputed. At some point after requesting the loan, Respondent created and gave the Lindseys a draft deed of trust indicating that he was placing his house in trust for the Lindseys' benefit.[15] According to Respondent, however, after he informed the Lindseys he had accrued only $75,000.00 of equity in his house, the parties agreed it was not worthwhile to follow through with the deed of trust.

Although Mr. Lindsey affirms that Respondent disclosed the limited equity in his house, Mr. Lindsey believes the parties nonetheless agreed to partially secure the loan with a deed on Respondent's house, such that the Lindseys would hold the second lien on the residence. Mr. Lindsey also testified that, although he had entered into multiple real estate transactions in the past, he was not very knowledgeable about deeds and did not realize a deed of trust must be recorded to carry legal force.

On August 15, 2007, the Lindseys and Respondent finalized the $168,000.00 loan trans-

---

10. Ex. I at 11–18. Staff at Respondent's firm billed the Lindseys for legal work in March, April, and May 2007 and in March, April, and June 2008. *Id.* It appears that Respondent himself had last worked for the Lindseys in early 2006. *Id.* at 10.

11. As Mr. Lindsey explained at the disciplinary hearing, he preferred not to share the fact of the loan with common acquaintances at Merrill Lynch.

12. Ex. F.

13. Stip. ¶¶ 1(bb)-(cc).

14. Mr. Lindsey testified he had sufficient time to reflect before reaching a decision on the loan.

15. Stip. ¶¶ 1(w)-(x); Ex. 3.

action.[16] As reflected in the promissory note he drafted, Respondent agreed to pay the Lindseys ten percent interest per year, with eleven interest-only monthly payments of $1,375.00 beginning on September 15, 2007, and one final payment of $169,375.00 on August 15, 2008.[17]

The signed note includes an uncompleted clause that reads, "The indebtedness evidenced by this Note is secured by a Deed of Trust dated August ____, 2007...."[18] The deed of trust was never finalized or recorded: the last draft is unsigned and contains blank spaces for dates and several sentences with strikethroughs.[19] Respondent did not remove the reference to the deed of trust from the promissory note, however, nor did the Lindseys insist upon receiving a final copy of the completed deed of trust or a corrected version of the note.[20]

From fall 2007 through spring 2008, Respondent made the prescribed monthly payments to the Lindseys, in some instances after the due date. In August 2008, he told Mr. Lindsey he could not pay off the balance of the loan. As such, the Lindseys agreed to extend the loan's maturity date by one year. Mr. Lindsey testified that he felt he had no choice at the time but to agree to the extension and hope for the best. Respondent drafted and signed a new promissory note providing for two interest-only payments of $1,375.00, due in September and October 2008, respectively, followed by nine payments of $16,000.00 each month from November 2008 through August 2009, when any remaining balance was due.[21] As with the initial loan, Respondent did not suggest the Lindseys seek independent legal advice or obtain their written consent to the terms of the loan.[22]

In partial satisfaction of the second note, Respondent made four payments of $1,375.00 each in 2008 and eight payments of $3,500.00 each in 2009.[23] He then stopped making payments on the loan in late 2009 and filed for bankruptcy, as explained in more detail below, leaving an unpaid loan balance of approximately $156,000.00.[24]

■ As noted above, Respondent admits that he did not provide the safeguards required by Colo. RPC 1.8(a) (2007) when entering into the initial loan transaction with the Lindseys and that he failed to comply with Colo. RPC 1.8(a) (2008) in their second loan transaction.[25] Colo. RPC 1.8(a) (2008) provides that a lawyer shall not enter into a business transaction with a client unless the lawyer advises the client to seek independent legal advice regarding the transaction, and the client gives written consent to the terms of the transaction and the lawyer's role therein.[26] Comment 2 to Colo. RPC 1.8(a)(3)

16. Stip. ¶ 1(r); Ex. 2.

17. Stip. ¶ 1(s); Ex. 2.

18. Ex. 2.

19. Ex. 3.

20. Mr. Lindsey testified that over a year later, he expressed concern the deed was unsigned; he recalled Respondent replying it was not a "big deal" and he would sign the deed. Respondent, who gave no testimony regarding this conversation, never did sign the deed.

21. Stip. ¶¶ 1(gg)-(ii); Ex. 4.

22. Stip. ¶¶ 1(jj)-(kk).

23. *Id.* ¶¶ 1(mm)-(nn). The last check was returned due to insufficient funds, but Respondent gave the Lindseys a valid cashier's check in its stead. *Id.* ¶¶ 1(oo)-(pp).

24. *Id.* ¶ 1(qq).

25. *Id.* ¶ 2. Respondent claimed it did not occur to him that Colo. RPC 1.8(a) applied to his transactions with the Lindseys because he was not performing legal services for them at the time of the loan, and he primarily viewed Mr. Lindsey as a friend rather than a client. Colorado Supreme Court case law provides that "the attorney-client relationship is an ongoing relationship giving rise to a continuing duty to the client unless and until the client clearly understands, or reasonably should understand, that the relationship is no longer to be depended on." *People v. Bennett*, 810 P.2d 661, 664 (Colo.1991) (quotation omitted). Because Respondent had performed legal services for the Lindseys and had given them no reason to believe their attorney-client relationship had terminated, Respondent was bound by Colo. RPC 1.8(a).

26. The 2007 and 2008 versions of Colo. RPC 1.8(a) are similar but not identical. The 2008 version of Colo. RPC 1.8(a)(3) explicitly provides that the client must give written informed consent to the lawyer's *role* in the transaction, while the 2007 version of that subsection simply states

(2008) clarifies that a lawyer, when necessary, should discuss material risks of a proposed loan with a client before accepting the loan.

These safeguards are mandated because "[a] lawyer's legal skill and training, together with the relationship of trust and confidence between lawyer and client, create the possibility of overreaching when the lawyer participates in a business, property or financial transaction with a client." [27] Even though the Lindseys were somewhat sophisticated in financial matters and had access to other advisers, they had a right to expect that Respondent would structure the loan to protect their interests.[28] But Respondent failed to recognize the special duties he owed the Lindseys. By neglecting to provide the safeguards that would alert the Lindseys to his own self-interest, as contemplated by Colo. RPC 1.8(a), Respondent acted without the vigilant dedication to his clients' interests to which they were entitled.

■ The Hearing Board must determine whether Respondent also breached Colo. RPC 8.4(c) in the Lindsey loan transactions, as the People charge. The People advance several arguments for the proposition that Respondent's conduct in these transactions involved dishonesty, fraud, deceit, or misrepresentation in violation of Colo. RPC 8.4(c).

First, the People argue that Respondent misrepresented to the Lindseys the available amount of equity in his house. The evidence, however, does not support the People's contention. Mr. Lindsey testified that Respondent disclosed he had about $75,000.00 in equity—an insufficient amount to fully secure the loan—and the People have not directed us to evidence clearly demonstrating that Respondent's representation was inaccurate.

The People next contend that Respondent misrepresented to the Lindseys that the loan would be secured by a deed of trust on his house. As noted above, Respondent and Mr. Lindsey gave conflicting testimony on this issue. We find it likely that the two men miscommunicated about the terms of the loan: the transaction took place through an informal process without face-to-face meetings and Mr. Lindsey had a hazy understanding of recording principles—both factors that could lead to confusion.

Perhaps more fundamentally, the informal and friendly context of this transaction suggests to us that Respondent lacked the reckless state of mind in his communications with the Lindseys necessary to support a violation of Colo. RPC 8.4(c).[29] The climate of this transaction was notably casual, as evidenced by Mr. Lindsey's comment, "As to terms, repayment, interest rate and all, we'll work something out," his expressed desire to remain "discreet," and his failure to insist upon receiving completed, signed copies of the promissory note and deed of trust. In light of Mr. Lindsey's apparent propensity to help Respondent regardless of the details of the loan, any ambiguity in Respondent's representations about the deed of trust more likely reflects the transaction's informal context than a disregard for the truth. Therefore, we do not find clear and convincing evidence that Respondent violated Colo. RPC 8.4(c) by misrepresenting that the Lindseys' loan would be secured.[30]

---

that the client must consent in writing to a business transaction with the client's lawyer. In addition, the comments to the 2007 rule did not direct lawyers to discuss the material risks of loans with clients.

**27.** Colo. RPC 1.8(a) (2008) cmt. 1.

**28.** *See In re Conduct of Montgomery,* 292 Or. 796, 643 P.2d 338, 341 (1982) (holding that, even where a client was more sophisticated in business matters than the lawyer himself, the lawyer should have assumed the client was "relying on the lawyer for the legal aspects of the [loan from the client to the lawyer] to the same extent that the client would rely on the lawyer for advice

were the client making the loan to a third person").

**29.** *See In re Fisher,* 202 P.3d 1186, 1203 (Colo. 2009) ("a mental state of at least recklessness is required for an 8.4(c) violation").

**30.** We also note that, even if Respondent initially told Mr. Lindsey he would record the deed but later came to believe Mr. Lindsey deemed recording unnecessary, such a statement probably would not amount to a cognizable misrepresentation. *Cf. Mehaffy, Rider, Windholz & Wilson v. Cent. Bank Denver, N.A.,* 892 P.2d 230, 237 (Colo. 1995) ("In a claim for negligent misrepresentation, the misrepresentation must be of a material

· For similar reasons, we also decline to subscribe to the People's theory that Respondent falsely told the Lindseys they would be the secondary lienholders on his house. Respondent testified he did not tell Mr. Lindsey their lien would be in the second position, but rather the parties focused on the amount of equity in Respondent's house. And our general skepticism that Respondent recklessly or knowingly misled Mr. Lindsey about the transactions is reinforced in this instance by the multiple meanings of the term "secondary," which can mean either "of the second position" or "of a subordinate position." [31] If he said the Lindseys would be secondary lienholders, Respondent could have intended to convey that their lien would be in a subordinate position, while Mr. Lindsey could have mistakenly construed that statement to mean the Lindseys' lien would be in the second position.

Finally, the People argue that Respondent engaged in subterfuge by omitting mention of the Culter Trust from the deed of trust and failing to explain to the Lindseys that the Culter Trust held official title to the house. We could not credit this argument even if we found by clear and convincing evidence that Respondent agreed to secure the Lindseys' loan with a deed of trust. Respondent is the sole trustee of this revocable, self-settled trust, so it appears he could have deeded the house out of the trust and into his personal possession in order to satisfy his obligations to the Lindseys. The suggestion that Respondent hid the Culter Trust in order to defraud the Lindseys is neither supported by Mr. Lindsey's testimony nor consistent with our assessment of Respondent's character. In fact, the evidence demonstrates Respondent's commitment to honoring his debt. Therefore, as with the remaining Colo. RPC 8.4(c) claims asserted by the People with respect to the Lindsey loan, we find no clear and convincing evidence of a rule violation on this score.

fact that presently exists or has existed in the past. A promise relating to future events without a present intent not to fulfill the promise is not actionable.") (citation omitted).

**31.** *See Merriam–Webster's Collegiate Dictionary* 1121 (11th ed. 2009) (defining "secondary" both as "of a second rank, importance, or value" and

## Landers Loan

■ Beginning in 2003, Respondent periodically performed legal work on behalf of Kenneth C. Landers Jr. ("Landers"), who had retired relatively early as the owner and president of a pet food processing business. As part of this work, Respondent updated Landers's estate planning documents in early 2008. Respondent and Landers did not have a social relationship.

In April 2008, Respondent told Landers he had an opportunity to purchase a law firm from a retiring lawyer and—knowing Landers had previously made loans to friends and family members—asked for a loan of $90,000.00.[32] According to Respondent, he told Landers he needed capital to support his current firm before he could purchase the new firm. Landers, however, testified that Respondent did not mention financial difficulties at his current firm. Instead, Landers recalled Respondent saying he would use the loan for a promising opportunity to buy another firm. Landers's testimony suggested that he was particularly interested in helping Respondent in this venture because Landers himself had benefited from similar opportunities earlier in his own career. Landers agreed to Respondent's proposal and wrote him a check for $90,000.00.

The opportunity to which Respondent ostensibly referred involved one of his prior employers, Walter Hopp, Esq. ("Hopp"). Hopp called Respondent in October 2007 to follow up on two or three previous conversations about Respondent's interest in purchasing Hopp's Longmont firm upon Hopp's retirement. During their October 2007 discussion, Hopp did not mention a purchase price for the firm. Hopp formed the impression that Respondent preferred to remain in Broomfield and was not serious about buying the firm, and Respondent and Hopp never again discussed the possibility.

as "not first in order of occurrence or development"); *Black's Law Dictionary* 628 (2d pocket ed. 2001) (defining "secondary" as "(Of a position, status, use, etc.) subordinate or subsequent").

**32.** Stip. ¶¶ 1(tt)-(vv).

After Landers agreed to the proposed loan, Respondent drafted and signed a promissory note dated April 3, 2008.[33] As reflected in the note, Respondent agreed to pay Landers interest at the rate of ten percent per year and to make three payments of $33,000.00 each on July 15, 2008, October 15, 2008, and January 15, 2009.[34] Respondent and Landers did not discuss or arrange for security on the loan. Further, Respondent did not recommend that Landers solicit independent advice concerning the loan, nor did Respondent obtain Landers's written consent to the terms of the transaction[35] or disclose his existing debts—and Landers never requested any such information.

Respondent made two payments to Landers totaling approximately $3,000.00 and then stopped repaying the debt. In an August 2009 email, Respondent explained that he needed to file for bankruptcy but remained committed to repaying Landers.[36]

As noted above, it has already been established that Respondent failed to abide by Colo. RPC 1.8(a) (2008) in the loan transaction with Landers.[37] The People also charge that Respondent violated Colo. RPC 8.4(c) by falsely representing to Landers that he would use the loan for a business investment rather than to cover his current expenses and debts.

The Hearing Board agrees with the People that Respondent violated Colo. RPC 8.4(c) by misrepresenting his intended use of the loan to Landers. We do not doubt that Respondent characterized his loan request partly in terms of supporting his current firm and that he hoped in some time to buy another firm. But Landers's clear recollection of Respondent's comments regarding the law firm purchase opportunity persuades us that Respondent framed this opportunity as an imminent prospect for which he sought the loan, at least in part. That representation was not fully honest; six months had passed since Respondent had spoken to Hopp, that discussion had only been phrased in general terms, and Respondent in fact needed to repay the Lindseys and Cook and to keep his current firm afloat before he could realistically consider purchasing another firm. Indeed, Landers was not a friend of Respondent's who was likely to have extricated him from a precarious financial situation, so Respondent had a strong incentive to downplay his financial difficulties and convince Landers that the loan was a worthy investment opportunity in order to maximize the chances that Landers would advance the loan. In fact, Landers testified that he probably would not have agreed to the loan had he understood Respondent's level of indebtedness and the remote possibility Respondent would buy another law firm. Accordingly, we find that Respondent misrepresented material facts to Landers in violation of Colo. RPC 8.4(c).

### Bankruptcy Proceedings

After the events recounted above, Respondent filed for Chapter 13 bankruptcy in October 2009. He explained to Landers that he did so as a result of a judgment his ex-wife had secured against him.[38] Respondent's case was converted to a Chapter 7 bankruptcy proceeding in December 2009.

Respondent testified that he never meant to evade his debts to the Lindseys and Landers by filing for bankruptcy; to the contrary, he instructed his attorney to ensure those debts were affirmed in the bankruptcy process. Even had he not done so, the debts appear to have been non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), which provides that bankruptcy proceedings cannot relieve debtors of debts for money obtained by false pretenses or representations. Violations of Colo. RPC 1.8(a) have been found to constitute false pretenses or representations

33. *Id.* ¶ 1(xx); Ex. 5.

34. Stip. ¶ 1(yy); Ex. 5.

35. Stip. ¶¶ 1(aaa)-(bbb).

36. Ex. C.

37. Respondent testified that he did not realize Colo. RPC 1.8(a) applied because he was not performing legal work for Landers at the time of the loan transaction. Respondent now concedes he violated this rule because he had not terminated his attorney-client relationship with Landers.

38. *Id.*

within the meaning of 11 U.S.C. § 523(a)(2)(A).[39]

Respondent stipulated in summer 2010 that his debts to the Lindseys and Landers were non-dischargeable.[40] In the judicially approved stipulations, Respondent agreed to pay $1,425.00 monthly to the Lindseys and $1,075.00 monthly to Landers, with full payment of any remaining balances on October 1, 2014, and September 1, 2015, respectively.[41] At the time of the disciplinary hearing, Respondent was current on his payment obligations under both stipulations.

## IV. SANCTIONS

■ The American Bar Association *Standards for Imposing Lawyer Sanctions* (1991 & Supp. 1992) ("ABA *Standards* ") and Colorado Supreme Court case law govern the selection and imposition of sanctions for lawyer misconduct. ABA *Standard* 3.0 mandates that, in selecting the appropriate sanction, the Hearing Board consider the duty breached, Respondent's mental state, the injury or potential injury caused, and the aggravating and mitigating evidence.

### ABA *Standard* 3.0—Duty, Mental State, and Injury

*Duty:* Respondent violated his duties to his clients by neglecting to provide the safeguards mandated by Colo. RPC 1.8(a) and by failing to provide fully truthful information to Landers about the purpose of his loan request, as required by Colo. RPC 8.4(c).

*Mental State:* Respondent avers he mistakenly believed he was not bound by Colo. RPC 1.8(a) because he primarily viewed Mr. Lindsey as a friend and because he was not performing work for the Lindseys or Landers at the time of the loan transactions. The Hearing Board concludes Respondent did not intentionally violate Colo. RPC 1.8(a), but we find he did breach that rule knowingly because he acted with conscious awareness that he was entering into business transactions with the Lindseys and Landers and that he had not terminated those attorney-client relationships.[42] Our conclusion that Respondent knowingly violated Colo. RPC 1.8(a) is tempered to some degree by the fact that the 2007 version of the rule was less clear than the 2008 version in directing lawyers to recommend clients seek independent legal advice, to discuss material risks of proposed transactions with clients, and to secure not only clients' written consent to any transactions but also their consent to the lawyer's role in such transactions.

We also conclude that Respondent knowingly breached Colo. RPC 8.4(c) because the possibility of purchasing a law firm was not his immediate motivation for requesting a loan from Landers.

*Injury:* Respondent caused injury to the Lindseys and Landers by failing to abide by Colo. RPC 1.8(a). Had he provided the appropriate safeguards, his clients might well have insisted upon full security for the loans or declined altogether to take part in the transactions. Landers, in particular, probably would have investigated Respondent's creditworthiness had he known Respondent sought the loan to address financial difficulties rather than to purchase another law firm. As a result of their ill-advised loans to Respondent, the Lindseys and Landers have lost access to large sums of money for a

---

**39.** *See In re Riebesell*, 586 F.3d 782, 791 (10th Cir.2009) (holding that "failure to make the disclosures required by [Colo. RPC] 1.8 constitutes a 'false representation' within the meaning of § 523(a)(2)(A)").

**40.** Exs. 16, 16B.

**41.** *Id.;* Ex. 17. Respondent also testified that his debt to Cook was not discharged in the bankruptcy proceeding and he is continuing to repay that debt.

**42.** *See* ABA *Standards*, Definitions, § 1.1 (defining "knowledge" as "the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result"); *People v. Foreman*, 966 P.2d 1062, 1065 (Colo.1998) ("Ignorance of the requirements of a Rule of Professional Conduct does not transform knowing conduct into conduct that is merely negligent."); *People v. Potter*, 966 P.2d 1060, 1062 (Colo.1998) (holding that although a lawyer who violated the predecessor to Colo. RPC 1.8(a) "did not have the conscious objective to deceive [his client] or to take advantage of her, he was aware of the circumstances and the consequences of his conduct. His mental state was therefore greater than one of negligence.").

lengthy period; in addition, they have incurred legal bills in the course of their undoubtedly stressful efforts to recover their funds.[43] Further, we find that Respondent's breach of Colo. RPC 8.4(c) caused actual harm to Landers because his misrepresentation eroded the trust that underlies the attorney-client relationship.

## ABA *Standard* 9.0—Aggravating and Mitigating Factors

Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed, while mitigating factors may justify a reduction in the severity of the sanction. The Hearing Board considers evidence of the following aggravating and mitigating circumstances in deciding the appropriate sanction.

*Dishonest or Selfish Motive—9.22(b):* We find that ignorance of the applicable ethical rules, rather than a dishonest or selfish motive, led Respondent to violate Colo. RPC 1.8(a). But we do find Respondent had a somewhat self-serving goal of persuading Landers to loan him money when he mischaracterized his intended use of the funds. However, taking into account Landers's testimony that he does not consider Respondent dishonest, we do not accord great weight in aggravation to this factor.

*Pattern of Misconduct—9.22(c):* Respondent failed to provide the safeguards required by Colo. RPC 1.8(a) in separate transactions with two clients. In light of the relatively restricted scope of this pattern of misconduct, we accord only limited weight to this aggravating factor.[44]

*Multiple Offenses—9.22(d):* Although Respondent violated both Colo. RPC 1.8(a) and 8.4(c) in the Landers loan transaction, these violations arose out of the same instance of insufficient disclosure. As such, it is inappropriate to apply ABA Standard 9.22(d) here.

*Substantial Experience in the Practice of Law—9.22(i):* Respondent was licensed to practice law in 1993. His substantial experience as an attorney is an aggravating factor.

*Absence of a Prior Disciplinary Record—9.32(a):* As the People concede, Respondent's lack of prior discipline in his eighteen years of practice merits significant weight in mitigation.

*Personal and Emotional Problems—9.32(c):* Respondent's misconduct is mitigated by personal problems he faced on several fronts near the time of his disciplinary offenses. Respondent experienced stress due to Bates's abrupt separation from their law firm in July 2007 and the resulting financial pressures. In addition, in fall 2007, he faced multiple post-decree motions filed by his ex-wife, including an effort to revoke joint custody of their children.

*Efforts to Make Restitution—9.32(d):* ABA Standard 9.4(a) provides that forced or compelled restitution should not be considered as an aggravating or mitigating factor. Respondent stipulated in the bankruptcy proceeding that his debts to the Lindseys and Landers are non-dischargeable pursuant to 11 U.S.C. § 523.[45] Thus, while we commend Respondent for his demonstrated commitment to repaying his debts, we cannot consider such payments in mitigation.

*Cooperation in the Disciplinary Process—9.32(e):* Respondent has cooperated throughout this proceeding and the underlying investigation, including by stipulating to violations of Colo. RPC 1.8(a). The People allow that Respondent's cooperation is a substantial mitigating factor.

*Character or Reputation—9.32(g):* Respondent has contributed to the legal com-

---

**43.** Although a client's deprivation of the amounts of money at issue here typically would qualify as a serious injury, the Lindseys and Landers appear to enjoy relatively comfortable financial positions, and we heard no testimony that the unavailability of the loan funds caused them substantial harm. Thus, we view the harm here as appreciable but not serious.

**44.** *Cf. In re Roose,* 69 P.3d 43, 49 (Colo.2003) (apparently giving no weight to the aggravating factors of a pattern of misconduct or multiple offenses where an attorney's misconduct "actually involved only two separate acts, arising from the same lack of understanding, and the same misguided perception of zealous advocacy, in the same case").

**45.** Exs. 16, 16B.

munity by co-chairing a young lawyers association, assisting with a guide to estate planning law for new attorneys, writing several articles for The Colorado Lawyer, and providing pro bono legal services. His involvement in the broader community includes publishing articles in business journals and serving Metro Denver Partners (a youth-mentoring organization), the Denver Zoo Wild Things Society, the chambers of commerce in Superior and Broomfield, and his homeowners' association.

In addition, Hopp testified that Respondent was one of the better performing attorneys of the twenty he has directly supervised and that Respondent did not try to oversell services to clients. Hopp trusted him enough to consider conveying his firm to Respondent, although Hopp considers Respondent's actions at issue here to be "stupid." Respondent's generally sound reputation and character is a mitigating factor.

*Delay in Disciplinary Proceedings— 9.32(j):* Respondent claims that the continuation of the disciplinary hearing from May 2011 to September 2011 adversely affected him by prolonging the resolution of this matter. But Respondent's own counsel requested an extension of time to file the answer, resulting in the delay of the at-issue conference and the hearing deadlines set at that conference. In addition, Respondent agreed to continue the hearing and in fact asked the PDJ to schedule the hearing after the summertime, when he had day-to-day custody of his sons. The short delay in these proceedings does not warrant credit in mitigation.

*Remorse—9.32(l):* Respondent avers he is "absolutely remorseful" and "feels sick" about this matter. He regrets losing Mr. Lindsey's respect and friendship, in particular, and he wishes he had viewed the requirements of Colo. RPC 1.8(a) in different terms. Respondent's direction to his attorney to ensure his debts to the Lindseys and Landers were not discharged in bankruptcy corroborates his expressed sentiments. The Hearing Board finds Respondent to be genuinely remorseful, and we thus accord some weight to this mitigating factor.

### Sanctions Analysis under ABA *Standards* and Case Law

ABA *Standard* 4.32 establishes the presumptive sanction for Respondent's violations of Colo. RPC 1.8(a). That *Standard* provides suspension is generally appropriate when a lawyer does not fully disclose to a client the possible effect of a known conflict of interest, and in so doing causes the client injury or potential injury.

Turning to Respondent's violation of Colo. RPC 8.4(c), ABA *Standard* 4.62 provides that suspension is the presumptive sanction when a lawyer knowingly *deceives* a client, thereby causing the client injury or potential injury. ABA *Standard* 4.63, meanwhile, holds that public censure is typically appropriate when a lawyer negligently *fails to provide* a client with accurate or complete information and causes the client harm or potential harm. Here, although Respondent violated Colo. RPC 8.4(c) knowingly, he did so through a failure to provide complete information rather than outright deceit, so ABA *Standards* 4.62 and 4.63 are both relevant.

A review of Colorado Supreme Court case law addressing conflicts of interest calls to mind Justice Coats's observation that "individual circumstances make extremely problematic any meaningful comparison of discipline ultimately imposed in different cases."[46] The adversaries in this proceeding point to remarkably divergent case law as guidance for the appropriate sanction in this matter.

On one hand, the People claim that the presumptive sanction here is disbarment but a fully served three-year suspension is adequate given the applicable mitigating factors. They draw parallels to several cases imposing disbarment, including *People v. McMahill*[47] and *People v. Schindelar.*[48] We find these cases, in which lawyers blatantly deceived and intentionally harmed clients, to be entirely distinguishable from the matter at hand.

46. *In re Rosen,* 198 P.3d 116, 121 (Colo.2008).

47. 782 P.2d 336 (Colo.1989).

48. 845 P.2d 1146 (Colo.1993).

In *McMahill,* a lawyer committed theft of two separate clients' funds by persuading them to provide him loans ostensibly secured by a fictitious estate and a property worth vastly less than he represented.[49] The lawyer not only failed to make required disclosures and obtain his clients' consent to the transactions, but he actively deceived his clients through "predatory and wholly reprehensible" conduct.[50] Moreover, the lawyer neglected a client's legal claim, he never repaid the clients' loans, he defaulted in the disciplinary proceeding, and no mitigating factors counterbalanced the multiple aggravating factors.[51]

In *Schindelar,* a lawyer borrowed nearly $75,000.00 through four separate transactions from an elderly, recently widowed client who was "especially vulnerable" and "particularly dependent upon the respondent for advice."[52] The attorney repaid her client only $334.00 before discharging the remainder of the debt in bankruptcy.[53] By failing to provide a host of required disclosures—as well as by neglecting to either recommend her client seek independent legal advice or obtain the client's consent to the conflict of interest—the lawyer violated several disciplinary rules, including the prohibition against intentionally prejudicing or damaging a client.[54]

Although we find the cases cited by the People to be inapposite, we also do not agree with Respondent that decisions resulting merely in public censure are directly analogous to this matter.

Respondent cites several cases in which lawyers violated conflict of interest rules negligently, rather than knowingly. For instance, in *People v. Odom,* a lawyer negligently failed to advise a client of possible claims against another of the lawyer's clients and neglected a separate client's case.[55] Balancing the sole aggravating factor of substantial legal experience against six mitigating factors, the Colorado Supreme Court ruled public censure was the appropriate sanction.[56] Several other decisions cited by Respondent have imposed public censure, consistent with *Odom,* in cases where lawyers' negligent violations of conflict of interest rules involved limited harm and a prevalence of mitigating factors.[57]

In another case cited by Respondent, *People v. Potter,* a lawyer received a public censure for having violated the predecessor to Colo. RPC 1.8(a) with a mental state greater than negligence.[58] But that attorney caused no actual or potential injury by accepting a loan from a client, nor did he violate Colo. RPC 8.4(c) or any other ethical rules.[59] Given Respondent's knowing state of mind and the appreciable injury his misconduct caused, we do not deem the cases he has put forward to be entirely analogous to the matter at hand.

Drawing from our independent review of case law, we find some guidance in *In re Fisher,* in which a lawyer representing a client in a dissolution of marriage case know-

49. 782 P.2d at 337–38.

50. *Id.* at 338.

51. *Id.* at 337–38.

52. 845 P.2d at 1147–48.

53. *Id.* at 1148.

54. *Id.* at 1148–49.

55. 829 P.2d 855, 856–57 (Colo.1992).

56. *Id.* at 858.

57. *See, e.g., People v. Farry,* 909 P.2d 1096, 1097–98 (Colo.1996) (publicly censuring a lawyer who negligently failed to advise a client of the lawyer's possible conflicts of interest, engaged in conduct prejudicial to the administration of jus-

tice, and disregarded a judicial ruling, where mitigating factors outweighed aggravators and no actual harm was occasioned); *People v. Fritze,* 926 P.2d 574, 575–76 (Colo.1996) (publicly censuring a lawyer whose "neglect and inexperience" caused him to negligently violate conflict of interest rules); *People v. Gebauer,* 821 P.2d 782, 784–85 (Colo.1991) (publicly censuring a lawyer who negligently breached conflict of interest rules).

58. 966 P.2d at 1061–62.

59. *Id.* at 1062. *Cf. People v. Stevens,* 883 P.2d 21, 23–24 (Colo.1994) (publicly censuring a lawyer who knew or should have known she was simultaneously representing clients with conflicting interests but who relied on a far more experienced attorney who "steer[ed] her into … a precarious situation," where no actual harm was caused and just one aggravating factor applied).

ingly obtained a promissory note secured by a deed of trust in the marital residence in order to secure his fees.[60] The lawyer violated Colo. RPC 1.8(a) by neglecting to advise his client to seek independent counsel and failing to secure her written consent to the conflict of interest.[61] In addition, by taking a deed in the marital residence, the lawyer violated Colo. RPC 1.8(j), which bars an attorney from obtaining a proprietary interest in the subject matter of the representation.[62] The lawyer also violated Colo. RPC 1.1 and 1.3 by failing to meaningfully pursue one of the client's primary objectives for the representation.[63] The Colorado Supreme Court imposed a six-month suspension, all stayed upon completion of a two-year probationary period.[64] Although the matter at hand involves a Colo. RPC 8.4(c) violation and *Fisher* does not, we view the violations of Colo. RPC 1.1, 1.3, and 1.8(j) in *Fisher* as roughly analogous in severity to Respondent's Colo. RPC 8.4(c) violation, such that the two cases bear useful comparison.

In light of the applicable ABA *Standards* and case law, we find that Respondent's misconduct warrants a six-month suspension, all stayed upon the successful completion of a three-year period of probation. The balance of aggravating and mitigating factors here favors a relatively lenient sanction. Moreover, the testimony by all four witnesses in this case persuades us that Respondent is fundamentally a well-intentioned lawyer who is unlikely to harm the public, can be adequately monitored during probation, and is fully able to perform legal services without discrediting the courts or the legal profession. During the probationary period, Respondent must not violate the Rules of Professional Conduct, he must continue to repay the Lindseys and Landers in accordance with the judicially approved repayment plans, and

he must report quarterly to the People on his adherence to those repayment plans.

## V. CONCLUSION

Polonius's familiar advice to "[n]either a borrower nor a lender be"[65] is particularly apt in the context of attorney-client relationships. Loans from clients to lawyers, in particular, present a "very real risk that the self-interest of the lawyer will interfere with the lawyer's exercise of free judgment on behalf of the client...."[66] In this matter, when Respondent sought loans from his clients, he should have carefully reviewed the rules of conduct to determine whether safeguards applied and then should have scrupulously adhered to those rules by giving his clients complete information regarding the loans. By failing to do so, he violated Colo. RPC 1.8(a) and 8.4(c). In light of the nature of this misconduct and the prevalence of mitigating factors, the appropriate sanction here is a six-month suspension, all stayed upon successful completion of a three-year period of probation with conditions.

## VI. ORDER

The Hearing Board therefore **ORDERS:**

1. **BRANDON S. CULTER,** attorney registration number 23141, is **SUSPENDED FOR SIX MONTHS, ALL STAYED UPON SUCCESSFUL COMPLETION OF A THREE-YEAR PERIOD OF PROBATION, WITH CONDITIONS.** The stayed suspension and probation **SHALL** take effect only upon issuance of an "Order and Notice of Probation."[67]

2. Respondent **SHALL** comply fully with the repayment obligations to the Lind-

---

**60.** 202 P.3d 1186, 1190, 1204 (Colo.2009).

**61.** *Id.* at 1196.

**62.** *Id.* at 1196–97.

**63.** *Id.* at 1194–95.

**64.** *Id.* at 1204.

**65.** *William Shakespeare, The Tragedy of Hamlet, Prince of Denmark* act 1, sc. 3.

**66.** *Bennett,* 810 P.2d at 664.

**67.** In general, an order and notice of sanction will issue thirty-one days after a decision is entered pursuant to C.R.C.P. 251.19(b) or (c). In some instances, the order and notice may issue later than thirty-one days by operation of C.R.C.P. 251.27(h), C.R.C.P. 59, or other applicable rules.

seys and Landers set forth in the stipulations approved by the bankruptcy court, including any amendments thereto.[68]

3. Respondent **SHALL** submit reports and supporting evidence to the People quarterly, beginning on January 1, 2012, demonstrating his adherence to his repayment obligations to the Lindseys and Landers.

4. Respondent **SHALL** file any post-hearing motion or application for stay pending appeal with the PDJ **on or before December 8, 2011.** No extensions of time will be granted. If Respondent files a post-hearing motion or an application for stay pending appeal, the People **SHALL** file any response thereto within seven calendar days, unless otherwise ordered by the PDJ.

5. Respondent **SHALL** pay the costs of these proceedings. The People **SHALL** submit a "Statement of Costs" within fifteen days from the date of this order. Respondent's response to the People's statement, if any, must be filed no later than ten days thereafter.

**68.** *See* Ex. 17 (*In re Culter,* No. 09–31268–SBB (Bankr.D.Colo. July 22, 2010) ("Order Approving Stipulation to Resolve Complaint for Determination of Non–Dischargeability of Certain Debt Pursuant to 11 U.S.C. § 523 and for Monetary Judgment")); Ex. 16B (*In re Culter,* No. 09– 31268–SBB (Bankr.D.Colo. Sept. 21, 2010) ("Order Approving Stipulation to Nondischargeability of Debt and Motion to Approve")).